[File No. Cr. 86.]

STATE OF NORTH· DAKOTA, Respondent, v. WESLEY L. ISENSEE, Appellant.

(249 N. W. 898.)

2

Opinion filed August 24, 1933.

*Shure & Murphy,* for appellant.

4

*Frank L. Temple,* State's Attorney and *James Morris,* Attorney General, for respondent.

CHRISTIANSON, J.   The defendant was convicted of the crime of

wilfully setting fire to and burning personal property with intent to defraud the insurer in contravention of § 4, chapter 115, Laws of North Dakota 1929, and appeals from the judgment of conviction and from the order denying his motion for a new trial.

The first assignment of error is predicated upon the overruling of defendant's demurrer to the information. The real ground of the demurrer is that the statute under which the prosecution was had is violative of § 61 of the state constitution and that, consequently, the information did not state facts sufficient to constitute a public offense.

Section 61 of the state constitution reads: "No bill shall embrace more than one subject, which shall be expressed in its title, but a bill which violates this provision shall be invalidated thereby only as to so much thereof as shall not be so expressed."

The title of the Act under which the prosecution was had reads as follows: "An Act defining arson, prescribing punishment for burning or attempting to burn buildings or other property, and burning of buildings or other property to defraud insurer, and repealing §§ 9849, 9850, 9851, 9852, 9853, 9854, 9855, 9856, 9857, 9858, 9859, 9860, 9861, 9862, 9863, 9864, 9865, 9866, 9867 of the Comp. Laws of 1913."

Section 1 of the Act defines arson and prescribes the punishment therefor. Section 2 makes it an offense to wilfully and maliciously set fire to, or burn buildings other than a dwelling whether the property is that of the perpetrator or another. Section 3 makes it an offense for any person to wilfully and maliciously set fire to or cause to be burned any barrack, crib, rick or stack of hay, corn, etc. Section 4 of the Act (under which the defendant is charged) reads as follows: "Any person who wilfully and with intent to injure or defraud the insurer sets fire to, or burns or causes to be burned or who aids, counsels or procures the burning of any goods, wares, merchandise or other chattels or personal property of any kind, whether the property of himself or of another, which shall at the time be insured by any person or corporation against loss or damage by fire; shall upon conviction thereof, be sentenced to the county jail not to exceed one year, or to the penitentiary not to exceed five years." (N. D. Laws 1929, § 4, chap. 115.)

Section 5 makes it an offense for any person to wilfully and maliciously attempt to set fire to or burn or aid, counsel or procure the burning of any of the buildings or property mentioned in the preceding

sections. Section 6 makes it a crime to place or distribute any inflammable explosive material or substance or any device in any building or property mentioned in the foregoing sections in an arrangement or preparation with intent to eventually wilfully and maliciously set fire to or burn the same.

Appellant contends that the statute embraces more than one subject and, consequently, is violative of § 61 of the constitution. It is argued that § 4 is a new statute with a different end and purpose than that of the other provisions in the Act. It is said that the object and purpose of this statute was the protection of insurers and not the protection of property. It is, also, argued that the statute is violative of § 61 of the Constitution in this: that § 1 of the Act alters the definition of arson and makes it an offense to set fire to or burn certain kinds of houses "regardless of habitation or possession;" that § 2 of the Act creates a new and distinct offense, and the same argument is advanced as regards § 3. In our opinion, the contentions thus advanced cannot be sustained. We are aware of no reason why the legislative assembly may not in one statute enumerate the several acts which it seeks to inhibit so far as wrongful destruction of property by fire is concerned, and define the several acts inhibited as different offenses. It seems rather that it is desirable to place all inhibited acts of this nature in one legislative enactment. An Act which seeks to deal with and prescribe appropriate penalties for the destruction of property by fire cannot, we think, be said to embrace more than one subject within the constitutional rule. Such statute has one main object and purpose in view, namely, to deal with and prescribe appropriate penalties for those who, by means of fire, commit, or attempt to commit, wrongful acts.

Constitutional provisions similar to § 61 are in force in many of the states in the Union. The cases that have arisen cover a multitude of subjects. Corpus Juris states the general rule to be deduced from the several decisions thus: "All matters which are germane to and connected with the general subject of a statute may be included in its provisions without rendering it violative of a constitutional provision prohibiting a statute from embracing more than one subject, and a statute, no matter how comprehensive it may be or how numerous its provisions, complies with the constitutional requirement if a single main purpose is held in view and nothing is embraced in the act except what

is naturally connected with and incidental to that purpose. Thus, if desired, the entire statutory law upon a subject may be incorporated in one statute; and civil and criminal provisions may be incorporated in the same act." 59 C. J. pp. 800, 802.

This court has, also, considered the purpose and effect of § 61 of the constitution in many cases. See State ex rel. Goodsill v. Woodmansee, 1 N. D. 246, 46 N. W. 970, 11 L.R.A. 420; State ex rel. Standish v. Nomland, 3 N. D. 427, 57 N. W. 85, 44 Am. St. Rep. 572; Richards v. Stark County, 8 N. D. 392, 79 N. W. 863; State ex rel. Kol v. North Dakota Children's Home Soc. 10 N. D. 493, 88 N. W. 273; Powers Elevator Co. v. Pottner, 16 N. D. 359, 113 N. W. 703; State ex rel. Erickson v. Burr, 16 N. D. 581, 113 N. W. 705; State ex rel. Poole v. Peake, 18 N. D. 101, 120 N. W. 47. See also State ex rel. Gaulke v. Turner, 37 N. D. 635, 164 N. W. 924; Chaffee v. Farmers' Co-op. Elevator Co. 39 N. D. 585, 168 N. W. 616; Great Northern R. Co. v. Duncan, 42 N. D. 346, 176 N. W. 992; Thompson Yards v. Kingsley, 54 N. D. 49, 208 N. W. 949.

In Chaffee v. Farmers' Co-op. Elevator Co. 39 N. D. 585, 168 N. W. 616, supra, this court said:

"The requirement that the subject shall be expressed in the title of the act relates to substance, and not to form. The requirement is addressed to the subject, and not to the details, of the act. None of the provisions of a statute will be held unconstitutional when they are related, directly or indirectly, to the same subject, having natural connection, and are not foreign to the subject expressed in the title. As very frequently expressed by the courts any provisions that are germane to the subject expressed in the title may properly be included in the act. Putnam v. St. Paul, 75 Minn. 514, 78 N. W. 90. The Constitution does not contemplate that the title shall employ anything more than general terms, leading to an inquiry into the body of the act. It does not contemplate that the title shall be an index, or furnish an abstract of the contents of the act. Generality or comprehensiveness of the title is not objectionable, provided the title is not misleading and is sufficient to give notice of the general subject of the proposed legislation and the interests likely to be affected. The choice of language is a matter within the legislative discretion. And if the title chosen fairly indicates the general subject of the act, and is comprehensive enough in its scope

reasonably to cover all the provisions thereof, and is not calculated to mislead either the legislature or the public, it is a sufficient compliance with the constitutional requirement, even though it be not the most appropriate that could have been selected. See 26 Am. & Eng. Enc. Law, 579–581; Lewis's Sutherland, Stat. Constr. 2d ed. §§ 116–121.

"The title must state the subject of the act for the purpose of information to members of the legislature and the public, while the bill is going through the forms of enactment. It is not required that the title should be exact or couched in the most precise language. 'It is sufficient if the language used in the title, on a fair construction, indicates the purpose of the legislature to legislate according to the constitutional provision; so that, making every reasonable intendment in favor of the act, it may be said that the subject or object of the law is expressed in the title.' " Lewis's Sutherland, Stat. Constr. 2d ed. § 121. As was said by this court in State ex rel. Erickson v. Burr, 16 N. D. 581, 587, 113 N. W. 705: "The title should be liberally, and not technically, construed. The construction should be reasonable. Conflict with the constitutional provision must appear clear and palpable, and, in case of doubt as to whether the subject is expressed in the title, the law will be upheld. Titles should be construed in connection with the law with the view of remedying the evil intended to be obviated by the Constitution makers,—that of preventing fraud or surprise upon the members of the legislature and the people by introducing provisions into the law independent of or foreign to the subject expressed in the title. If the subjects in the law are germane or reasonably connected with the subject expressed in the title, the constitutional requirement is sufficiently met." 39 N. D. 595, 596.

In Great Northern R. Co. v. Duncan, 42 N. D. 346, 176 N. W. 992, supra, this court held:

"The requirements of Section 61 of the Constitution, to the effect that no bill shall embrace more than one subject which shall be expressed in its title, are not violated where the title fairly indicates the general scope of a bill designed to accomplish a single object." (Syllabus, ¶ 7).

"Where a legislative bill considered in the light of facts generally known is designed to accomplish one general object, and this is fairly indicated in the title, the title is not multifarious within the inhibition

of § 61, although it indicates that several subjects related to the general object are embodied in the bill." (Syllabus, ¶ 8.) (42 N. D. 347.)

By applying these principles in the case at bar we inevitably reach the conclusion that the statute in question here does not contravene the provisions of § 61 of the Constitution. That statute deals with one general subject—the wrongful destruction of property by fire and the several provisions thereof are germane to, and reasonably connected with, the general subject which is, we think, fairly expressed in the title of the act.

The error next assigned is predicated upon the allowance of an amendment of the information. The facts on which this assignment of error is predicated are as follows: the state was permitted to and did file an amended information. The charging part of this information read in part as follows:—"that at said time and place the said defendant did wilfully and feloniously and with intent to injure, damage or defraud the insurers thereof, set fire to and burn, or cause to be burned," etc. The defendant at once filed a demurrer to the amended information. Defendant's attorney stated that the demurrer then filed was practically the same as the one that had been filed to the original information. Immediately thereafter the trial judge stated that he would allow the state to amend the new information by inserting the word "and" in place of the word "or," where the latter word is underscored in the foregoing quotation from the information. The Attorney General thereupon moved that the information be so amended. The motion was granted. No objection was made by or on behalf of the defendant whatsoever to the proposed amendment or the allowance thereof. The court thereupon inquired whether defendant was ready to plead. The defendant at once entered a plea of not guilty, whereupon the court inquired whether the parties were ready for trial. Defendant's counsel answered in the affirmative whereupon a jury was impanelled and the cause proceeded to trial. Appellant asserts that the procedure thus adopted was erroneous; that the information as amended should have been again verified and the defendant arraigned thereon.

We are agreed that the record discloses no prejudicial error. See 31 C. J. 645; State v. Gielen, 54 N. D. 768, 210 N. W. 971. The in-

formation in question here was verified by the State's Attorney of Cass county. He was present and participated actively in the trial, and so far as the record discloses he was the person who made the interlineation. The amendment here did not substantially change the charge made against the defendant. The crime charged remained in its essentials the same after as before the amendment. There was no objection by the defendant or his counsel to what took place or suggestion that the defendant desired to have a copy of the information as amended delivered to him and to be again arraigned. The interlineation was made before he entered a plea. He pleaded not guilty to the information as amended and put in issue the material averments thereof. That issue was tried without even a suggestion that the amendment was improperly made. There is not the slightest reason to believe that the defendant was prejudiced in the slightest degree by the procedure adopted or that he or his counsel at the time desired any other procedure to be had.

Our laws provide that an information may be amended in matter of form without a new verification at any time before the defendant pleads, without leave of the court; and that it may be amended at any time thereafter or during the trial as to all matters of form at the discretion of the court when the same can be done without prejudice to the rights of the defendant. Comp. Laws, 1913, § 10,633.

The next assignments of error are predicated upon rulings in the admission and exclusion of evidence. A proper understanding of these assignments requires a brief statement of facts.

The defendant was engaged in the automobile business in the city of Fargo, known as the Isensee Motor Company. Both new and second-hand cars were handled. The used cars were principally those which had been taken in on trade. The business was conducted in a two-story building with a full basement beneath. Defendant's business occupied the ground floor and the basement and the second story was occupied as a rooming house. The defendant also had another place of business in the city of Jamestown.

The principal witness for the prosecution was one Hart who, at the time of the fire, and for some time prior thereto, had been in the employment of the defendant as manager of the service and parts department.

The fire took place July 23rd shortly after 11:00 o'clock P. M. Hart testified to several conversations with the defendant before the fire wherein defendant discussed with him plans which he then had or was formulating looking toward the procuring of additional insurance and the proposed destruction of the various cars and other property by fire so as to enable him to collect the insurance. One conversation, according to Hart, occurred some three or four weeks before the fire on a trip which the defendant and Hart made from Fargo to a village some miles distant therefrom. According to Hart's testimony, on their return from this trip they went into the basement and the defendant then pointed out the combustible condition of the building, stating in effect that it would be practically impossible for a fire department to prevent complete destruction if a fire got started. According to Hart's testimony the defendant at that time even discussed with him a proposed new business to be established after the fire and with the proceeds received from the insurance policies. Hart further testified that shortly thereafter on that same day the defendant proposed that he (the defendant) write up a contract for the sale to Hart of a certain Oldsmobile Coupe in order that the defendant might obtain some immediate cash from the finance company. It was further intimated that the finance company would be paid off from the proceeds of the anticipated fire. It is undisputed that such contract was made and that Hart gave a note as evidence of a part of the purchase price and that the contract was negotiated with the finance company. The defendant Isensee, however, testified that the deal was exactly what it purported to be and that it was not in any sense a subterfuge; that Hart had sought repeatedly to purchase a car but that it had not been deemed good business to sell him one. Hart further testified that Isensee at other times thereafter approached him and discussed the anticipated fire with him and the plan he had to defraud the insurers. Hart also testified that in one of these conversations the defendant offered him a commission if he (Hart) would set the fire; that upon Hart's refusing to enter into any such agreement the defendant said to him: "Bill, I had a fire in Pine River, and if another fire happened to me while I was in town, it would make it appear to the insurance companies that I had something to do with it and it would make it hard to collect insurance." Hart further testified that the defendant told him he was

going to Minneapolis and directed Hart to have certain used cars then in storage in the city of Hillsboro brought down and put in the basement, all in anticipation of the contemplated fire. The evidence discloses that about noon on July 20th the defendant left Fargo and went first to Duluth and then to Minneapolis. He took with him some men, including one Skiem, who drove new cars that were received at Duluth from Duluth to Fargo. The defendant Isensee thereafter on July 21st went to Minneapolis. While there he went to see one Supornick, a private adjuster. The evidence discloses that Supornick later represented the defendant in the adjustment of the fire loss. The defendant returned to Fargo in the afternoon of July 22nd. While the defendant had been away the witness Hart had brought some four or five cars down from Hillsboro, also one or two cars from another garage in the city of Fargo. Hart testified that before leaving for Minneapolis on July 20th the defendant had instructed him to order fifty gallons of gasoline and put it in a tank in the basement in which kerosene was usually kept; that before leaving for Minneapolis defendant said to Hart: "I will get the stuff to do this job with while I am gone, it has got to be done right away; it is getting to the point where I can't even pay my help the first of the month." Hart further testified that on the morning of July 23rd the defendant also told him (Hart) that "he was going to pull the job right away as he had to have some money and that was the only way he could get it." Hart testified that at noon on July 23rd the defendant instructed Hart to have another employee wash the motor of a certain car with gas and air in the basement so as to create an odor of gasoline there.

The evidence discloses that on the evening of July 23rd the defendant, together with one Murphy, a representative of General Motors Acceptance Corporation, went into the country to repossess a car and returned to the defendant's place of business about 9:30 in the evening. Hart testified that defendant directed him to stay at the garage or in the vicinity as he wanted to see him later in the evening. The testimony discloses that Murphy and the defendant stayed in the defendant's office and discussed various business matters until about eleven o'clock. About this time Mr. Skiem, who had driven one of the cars from Duluth, came to the garage and called for the defendant.

Skiem testified that he had just come in from Duluth; that when he

came into the garage the defendant and Murphy were still engaged in the defendant's private office; that immediately upon Murphy's leaving he (Skiem) went in and reported to the defendant that he had brought the car from Duluth and wanted him to check up the car and see if it was OK and also take him (Skiem) home at the same time; that thereupon they went out of the building and entered the car and started to drive it with Isensee driving. The evidence discloses that they drove around the block, returned and stopped again in front of the garage; that Isensee went out, entered the building, stayed there for a short time, came out and drove away with the car.

Hart testified that while the defendant and Skiem were out in front of the garage he went into the basement, turned on the light and stepped in a puddle of gasoline at the foot of the stairway; that the doors of the cars in the basement were open and the upholstery of one of the cars saturated with gasoline; that a pile of tires and inner tubes near the foot of the stairway were wet with gasoline. Hart further testified that he thereafter came back to the first floor and sat down at a desk in the parts room; that the defendant Isensee came in, went through the parts room and down in the basement; that in a few minutes he came up and went out through the parts room; that on the way out he had the following conversation with Hart:

"Q. What did you say? A. 'Looks like you got everything fixed around here,' I said. He grinned or smiled and said: 'Yes, I have; I want to see you in a little bit, you wait here until I get back.'"

Hart further testified that in a few minutes thereafter an explosion occurred, followed by the fire; that he was partly stunned but succeeded in escaping from the building; that after the fire had commenced the defendant returned to the scene; that he then said to Hart: "If anybody asks where you were at, tell them you were blown out of the building;" and that he gave him the same instruction the following morning; that he further suggested that Hart go back to his former home in North Carolina and furnished him with a car and money to enable him to make the trip.

The evidence discloses without dispute that Hart did go back to North Carolina, but the defendant denies that he suggested to Hart that he do so or that he furnished him with a car. He claims on the

other hand that Hart obtained the car surreptitiously and by deceit from the manager of his business at Jamestown.

Hart also testified that after he had been in North Carolina for only a few days the defendant telegraphed him to return and also telegraphed him money for the expenses back to Fargo; that after he got back the defendant told him that he had sent for him because the adjuster "was raising Cain" because Hart had left town and that the defendant wanted him back so that a quick settlement could be effected with the insurance companies. The defendant Isensee denied much of the testimony given by Hart as regards the incidents connected with the trip to North Carolina. Defendant also offered certain testimony concerning this which was excluded. The particular facts as regards the North Carolina trip will be dealt with in more detail in connection with the assignment of error based upon the exclusion of such testimony.

One of the assignments of error is predicated upon the court's ruling in refusing to permit the defendant to show why he called on the adjuster Supornick in Minneapolis on July 21st. The defendant sought to show, both by his own testimony and the testimony of Supornick, the reason for and the nature of the business transacted with Supornick on that occasion. He was denied the opportunity to introduce this testimony, apparently on the ground that this testimony would be in the nature of a self-serving declaration. It is clear from the record that the prosecution laid considerable stress upon this circumstance, namely, that the defendant made the trip to Minneapolis and had a conference or conversation with Supornick, the private adjuster who afterwards represented him in adjusting the fire loss. We are of the opinion that the defendant was entitled to introduce this evidence.

Ordinarily, "it is relevant to put in evidence any circumstance which tends to make the proposition at issue either more or less improbable. . . . Whatever is a condition, either of the existence or non-existence of a relevant hypothesis, may be thus shown. But no circumstance is relevant which does not make more or less probable the proposition at issue." 1 Wharton, Ev. 3d ed. § 21. See also State v. Heaton, 56 N. D. 357, 364, 217 N. W. 531.

In a case of this kind,—where one party has adduced evidence tending to establish a fact adverse to the other and such other party seeks to

introduce evidence in reply,—the test of relevancy is whether the evidence offered tends to cut down, eliminate, explain or obviate the force of the evidence that the other party adduced or the fact which such evidence tended to establish. 1 Wigmore, Ev. 2d ed. § 34. See also Mills v. Riggle, 83 Kan. 703, 112 Pac. 617, Ann. Cas. 1912A, p. 616.

In the brief on this appeal counsel for the prosecution calls attention to the defendant's trip to Minneapolis and his meeting there with Supornick as evidence of defendant's scheme to defraud the insurers, and as a circumstance tending to establish his guilt of the offense charged. Evidence of the trip to Minneapolis and of the meeting between the defendant and Supornick having been introduced by the prosecution it was competent for the accused to prove any fact which reasonably tended to explain and answer the incriminating evidence that the prosecution had brought forth against him. 5 C. J. 578; 1 Wigmore, Ev. 2d ed. § 34.

Reference has been made to Hart's purchase of an automobile (which transaction, according to Hart, was merely a device to enable the defendant to obtain money from the finance company), and to Hart's trip to his former home in North Carolina. The defendant sought to introduce evidence to the effect that the transaction relating to the purchase of the automobile by Hart, among other matters included a proposed sale by Hart to the defendant of certain furniture (the purchase price of the furniture to be applied on Hart's indebtedness for the car) ; that during their negotiations Hart had pointed out to the defendant in a certain catalog the kind and class of his furniture; that check marks identifying the furniture were placed in the catalog at the time, and which catalog was produced upon the trial. The defendant further sought to show that the reason he wired money to Hart was that he had learned that Hart had made the trip to North Carolina in a car belonging to the defendant, which Hart had obtained from the manager of the defendant's establishment at Jamestown; that Hart had informed the defendant, from North Carolina, that the car was broken down, that he needed money to procure necessary repairs, and that the money the defendant wired was to enable Hart to procure the necessary repairs and enable him to bring the car back to North Dakota.

We are of the opinion that the defendant was entitled to introduce such evidence. The evidence relating to the furniture was a circum-

stance in a transaction that, according to the theory of the prosecution, was to some extent entwined with defendant's alleged fraudulent scheme. The evidence relating to defendant's reasons for wiring the money had a tendency to overcome the impression created by Hart's testimony.

The undisputed evidence is to the effect that the defendant on the night of the fire left his place of business with one Skiem who had brought one of the new cars from Duluth. Witnesses, both for the state and for the defense, testified to this effect. It is, also, undisputed that after the defendant and Skiem had driven around the block they returned and stopped in front of defendant's place of business; that the defendant then went into the building where he remained for a short time; that on coming out he and Skiem left in the car with defendant driving, and that later, when notified of the fire, defendant was at his home.

The street in front of defendant's place of business runs north and south. The defendant sought to show that after he and Skiem drove away the first time, and when the defendant started to drive in a northerly direction, Skiem informed him that he no longer lived where he formerly had lived, but that he had moved, and stated as his then place of residence a location south from the defendant's place of business and in the same general locality and direction from defendant's place of business that defendant himself resided.

Much of this proffered evidence was excluded and the exclusion is assigned as error. What has been said as regards the admissibility of the evidence offered by the defendant concerning the meeting between the defendant and Supornick is equally applicable here. The incident of defendant's return to the garage before he took Mr. Skiem to his home; the drive around the block, the return to and defendant's entry into his place of business, are matters upon which the prosecution apparently laid considerable stress. The theory of the prosecution is that the defendant set the fire when he went into the building after he returned from the trip around the block. Unexplained the short trip,—apparently with no objective,—was, to say the least, somewhat suspicious. It might readily be inferred that this aimless trip was somewhat of a ruse. In our opinion the defendant was entitled to introduce

evidence tending to explain the reason for the apparently aimless trip and why he returned to the building as he did. In short, he is entitled to introduce any evidence that will tend to overcome the adverse pro- bative effect of the incident if it were left unexplained. The defendant will, of course, not be permitted to introduce proof as to anything that was said or done during the course of the trip except such as is directly connected with and has some reasonable tendency to explain the oc- currence of the act in question.

After defendant had introduced his evidence and defendant's counsel had announced that the defendant rested his case, counsel for the prose- cution asked that the defendant be recalled for further cross-examina- tion. The request was granted and the defendant was subjected to ad- ditional cross-examination. Error is assigned upon the rulings made during such cross-examination. The cross-examination related to mat- ters not alluded to in the direct examination or in the former cross- examination. In response to questions propounded by counsel for the prosecution the defendant stated that at some time in the past he had had some connection with a corporation engaged in business at Pine River, Minnesota; also that his brother had had some connection with this corporation, but that the defendant had severed all connection with it some four years before the fire in question here occurred. The de- fendant further stated in answer to questions propounded by counsel for the prosecution that he at one time was president of a corporation known as Isensee Auto Co., Inc., which operated a garage business at Hawley, Minnesota. The defendant was thereupon required to testify further on such cross-examination, over appropriate objection, that the corpora- tion at Pine River had sustained a loss by fire, also that the corporation at Hawley, Minnesota, had sustained a loss by fire; that there was a large fire loss and some insurance coverage. The fire at Hawley, Min- nesota, occurred some eight years before the fire in question here.

In our opinion it was error prejudicial to the substantial rights of the defendant to compel him to give, or to admit, this testimony.

Obviously evidence of the fires at Pine River and Hawley was not admissible as tending to establish defendant's guilt of the offense with which he is charged in this case. The fires at Pine River and Hawley were wholly disconnected from, and had no relation whatever to, the

fire in question here. Evidence regarding these fires could in no sense tend to establish a motive, or identify the perpetrator or tend to show any general scheme or design. There is not even the slightest proof that the fires were incendiary in origin or that the defendant had any connection with them. The authorities are all agreed that in the circumstances here evidence of the other fires was not admissible as tending to establish plaintiff's guilt. Underhill, Crim. Ev. 2d ed. §§ 87, et seq.; 10 R. C. L. pp. 939, et seq.; 16 C. J. pp. 586, 593; State v. Gummer, 51 N. D. 445, 200 N. W. 20. See also People v. Grutz, 212 N. Y. 72, 105 N. E. 843, L.R.A.1915D, 229, Ann. Cas. 1915D, 167; Fish v. United States (C. C. A. 1st) 215 Fed. 544, L.R.A.1915A, 809.

Neither was the cross-examination permissive on the theory that the testimony sought to be elicited, and which was elicited, had a tendency to impeach, or affect the credibility of, the accused. It is true the defendant, by becoming a witness, waived his constitutional privilege and rendered himself subject to the same rules of cross-examination that apply to other witnesses. (State v. Kent (Pancoast) 5 N. D. 516, 67 N. W. 1052, 35 L.R.A. 518); but the questions propounded to the defendant here would have been improper for purposes of impeachment, or as affecting the credibility, if they had been propounded to a witness other than the accused. They were equally improper when propounded to him. They did not even relate to any acts of the defendant. They did not even go to the extent of stating that defendant had been accused of any wrongdoing in connection with the fires (State v. Kent (Pancoast) 5 N. D. 516, 557, 67 N. W. 1052, 35 L.R.A. 518), yet the questions and the answers returned thereto left room for the play of imagination and suspicion in the deliberations of the jury. The cross-examination was improper. The questions propounded, and the testimony which they called for and produced were not allowable for the purpose of impeachment, or as affecting credibility. State v. Kent (Pancoast) 5 N. D. 516, 556, 557, 67 N. W. 1052, 1063, 1064, 35 L.R.A. 518; State v. Nyhus, 19 N. D. 326, 124 N. W. 71, 27 L.R.A.(N.S.) 487; State v. Oien, 26 N. D. 552, 145 N. W. 424. See also State v. LaMont, 23 S. D. 174, 120 N. W. 1105.

The appellant, also, contends that the evidence is insufficient to sustain the verdict. This contention is, we think, without merit. If the testimony of the witness Hart is true,—and his testimony is not with-

out substantial corroboration,—there can be little doubt but that the defendant deliberately planned the destruction of the property in question here by fire for the purpose of defrauding the insurer. There is also ample evidence from which the jury could find that defendant had the opportunity, as well as the will and the motive, to set the fire, and that he did set it.

The remaining assignments of error fall into three classes: Some are without merit; as regards others the record is such as to preclude a review on this appeal; the others are not likely to arise upon another trial.

As indicated, we are of the opinion that the errors committed in the exclusion and admission of evidence were prejudicial to the substantial rights of the defendant and prevented him from having a new trial. This necessitates a reversal of the judgment and a new trial. Accordingly it is ordered that the judgment appealed from be reversed and the cause remanded for a new trial.

NUESSLE, Ch. J., and BURR, BIRDZELL and BURKE, JJ., concur.