JORDAN, PLAINTIFF IN ERROR, v. THE PEOPLE, DEFEND-
ANT IN ERROR.

**1. CONSTITUTIONAL LAW.**

The act of 1887 with reference to district courts is not unconstitutional,
and each of the judges therein provided for is authorized to exer-
cise the powers of a district court.

**2. PLACE OF HOLDING COURT.**

While the district court must be held at the county seat, it is not re-
quired to be held in any particular building.

**3. CONSTITUTIONAL LAW—INFORMATION.**

The statute providing for prosecution by information is not unconstitu-
tional.

**4. SAME.**

Section 926, Gen. Stats., which provides that it shall be sufficient in an
indictment for murder to charge that the defendant did feloniously,
willfully and of his malice aforethought kill and murder the deceased,
is not in conflict with the section of the bill of rights which provides
that in criminal prosecutions the accused shall have the right to de-
mand the nature and cause of the accusation.

**5. PRACTICE IN CRIMINAL CASES.**

When the defendant has introduced testimony which might influence
the jury to the conclusion that he was insane, it is proper for the
·prosecution to introduce evidence to show his sanity.

**6. HYPOTHETICAL QUESTIONS.**

In propounding hypothetical questions to experts, counsel are not con-
fined to facts admitted or absolutely proved, but may assume for
the purposes of the question any statement of facts which the evi-
dence tends to establish.

**7. COUNSEL—PRACTICE.**

Counsel for the state and for the defense stand before the jury on an
absolute equality.. The nature and scope of argument which will
be permitted is largely within the discretion of the presiding judge,
and an appellate court will interfere only when a gross abuse of
discretion is made to appear.

**8. PRACTICE ON REVIEW—PRESUMPTIONS.**

When neither the motion for a new trial nor the affidavits touching the
grounds thereof are preserved in the bill of exceptions, it will· be
presumed that the motion was properly·overruled.

*Error to the District Court of Arapahoe County.*

PLAINTIFF in error was proceeded against in the court be-
VOL. XIX—27

low by information.   He was convicted of murder in the first degree and sentenced accordingly.

Mr. H. B. O'REILLY and Mr. G. W. MILLER, for plaintiff in error.

Mr. EUGENE ENGLEY, attorney general, and Mr. H. T. SALE, for the People.

CHIEF JUSTICE HAYT delivered the opinion of the court.

Of the errors assigned, the ruling of the district court upon plaintiff in error's plea to the jurisdiction of that court may properly be considered first.   This raises two questions : *First :* The constitutionality of the act of 1887 with reference to district courts.   *Second :* The legality of the action of the court sitting at a place other than at the county court house. The act challenged, among other things authorizes the several judges of the district court to sit separately for the trial of causes, and provides that each " shall have and exercise all the powers and functions, as well in vacation of court as in term time, which he might have and exercise if he were the sole judge of said court."   Acts of 1887, p. 260.

It will be conceded that the act in question is in violation of the constitution as originally adopted, but to provide for the rapid increase of business resulting from an increase of population and the development of the state, sections 12 and 14 of article VI of the State Constitution were amended by a vote of the people in the year 1886.   The nature and extent of these amendments will appear from a reading of the sections as amended, the amendments consisting of the words inclosed in brackets :

" 12. The state shall be divided into judicial districts, in each of which there shall be elected by the electors thereof, one (or more) judge(s) of the district court therein (as may be provided by law), whose term of office shall be six years ; the judges of the district courts may hold courts for each other, and shall do so when required by law ; (and the gen-

eral assembly may, by law, provide for the selection or election of a suitable person to preside in the trial of causes in special cases)."

"14. The general assembly may (whenever two-thirds of the members of each house concur therein), (increase or diminish the number of judges for any district or) increase or diminish the number of judicial districts and the judges thereof."

It is contended that neither of these provisions authorizes or contemplates that such additional judges shall exercise the powers of a court. If this contention is well founded then the amendments are not only insufficient to authorize the legislature to grant any relief to the overburdened dockets of the courts, but authorize an unnecessary incumbrance upon the judicial system of the state. Since their adoption the number of judges has been increased in Arapahoe county from one to five. Now there are five departments of the district court in Arapahoe county, each presided over by a single judge. The argument of counsel if carried to its logical conclusion would result in the abolition of all district courts in districts having more than one judge. This must be the case because each judge is of equal importance and dignity and has like power with every other judge, and if one has no authority to preside over a court, then the authority of the others must be likewise limited.

It is said that the "intention of the legislature (in proposing the amendment) was perhaps to provide for additional courts as well as judges, but that it did not do so." It matters but little what the intention of the legislature may have been in the premises. The amendment having been ratified by the people the intention of the people is more important. It is unreasonable to suppose that the people intended to authorize mere sinecures. It is far more natural to assume that they intended that the additional judges should be provided with courts over which they might preside and thereby assist in the disposal of the public business. It is true the amendments in question do not in terms authorize the additional

judges to hold separate courts, and it is equally true that the amendments do not prohibit their doing so. The distinguishing feature between the federal and state constitutions is that the former is a grant of powers to Congress, while the latter operates as a restriction upon the plenary powers otherwise belonging to the state legislature. To defeat a state statute therefore, on the ground that it is unconstitutional, something more is required than to show that there is no provision of the constitution to authorize it; it must be further shown that it is prohibited. Here there is an entire absence of such a showing and the statute must be upheld.

As to the second question raised by the plea, it is only necessary to say, that while the court must be held at the county seat, it is not required to be held in any particular building.

*Second:* By a motion to quash, plaintiff in error raises an objection to prosecution by information. In this case the probable guilt of the accused was first ascertained and certified as the result of a previous preliminary examination. The case is therefore identical with the case of *In re Dolph,* 17 Colo. 35. In that case it was determined that prosecutions by indictments and information as concurrent remedies might be provided for by the legislature. In that case the same objections to the statute were raised as in this case. They were carefully considered and the validity of the statute maintained. It is unnecessary at this time to repeat the reasons then given. Upon reconsideration of the conclusions then reached, we see no reason to modify or change the same.

*Third:* It is urged that the information in this case does not charge murder in the first degree. Our statute declares it " shall not be necessary to set forth the manner in which or the means by which the death of the deceased was caused, but it shall be sufficient in every indictment for murder to charge that the defendant did feloniously, willfully and of his malice aforethought kill and murder the deceased." * * * General Statutes, sec. 926. Each count of the informa-

tion contains all the averments required by the statute and the additional charge that the killing was premeditated. The statute taking its origin in England has been adopted in a number of our states, and so far as we are advised wherever the question has been raised the statute has been held constitutional, and indictments in the form provided held sufficient to charge murder of the first degree. 2 Bishop's Criminal Procedure (2d ed.), secs. 523–539, and cases cited.

The act is not in conflict with the section of the bill of rights providing that "in criminal prosecutions the accused shall have the right * * * to demand the nature and cause of the accusation." An information must show the nature and cause of the accusation; *i. e.*, it must set out the crime charged. It need not set out the mode or manner of its perpetration, or the instrument or agency employed to accomplish the result. *Redus v. The People*, 10 Colo. 208; *State v. Meyers*, 99 Mo. 107; *Goersen v. The Commonwealth*, 99 Pa. St. 388; *Hill v. The People*, 1 Colo. 436.

The indictment in the Redus case was held sufficient to charge murder of the first degree without the word premeditated; *a fortiori* must the indictment in this case charging the murder to have been premeditated be held sufficient.

*Fourth:* In rebuttal the state was allowed to introduce evidence of medical experts as to the sanity of the prisoner, and this is assigned for error. It was not necessary for the state to prove the sanity of the plaintiff in error in the first instance, as every man is presumed to be sane until the contrary appears. In this case the cross-examination of the witnesses for the state and the direct testimony of the witnesses for the defendant tended to show some affection of his brain; technically called amnesia, or loss of memory. Although no witnesses introduced by the plaintiff in error testified that he was insane at the time of the commission of the crime charged, yet there was testimony which might have influenced the jury to this conclusion. Under the circumstances it was not only proper but wise for the state to meet the inferences which otherwise might have been in-

dulged by the jury. And the fact that these witnesses contradicted certain statements made by the defendant himself did not thereby render their evidence incompetent.

*Fifth:* It is further claimed that counsel for the state, in their hypothetical questions propounded to the experts, confused the facts in the case and garbled the evidence. Counsel are not confined to facts admitted or absolutely proved in propounding such questions, but may assume for the purposes of the question any statement of facts which the evidence tends to establish, and we find nothing in the questions propounded which goes beyond this. It was the province of the jury to determine the truth or falsity of the assumed facts.

*Sixth:* The next error assigned relates to the closing remarks of counsel. The district attorney during his address called one of the jurors by name. This was an indiscretion on the part of counsel that would no doubt have been rebuked by the court had its attention been called to it at the time, which it was not. The offense was not repeated, and we cannot see how defendant was injured thereby. With this exception we see nothing in the closing remarks of the district attorney that calls for the criticism indulged by counsel. In view of the frequency with which assignments of error in criminal cases are based upon arguments of the district attorney, we deem it advisable to call attention to the fact, which often seems to be overlooked, that counsel for the state and for the defense stand before the jury on an absolute equality. Each has an equal right to comment upon the facts in the case and the inferences deducible therefrom, and apply thereto the law as given by the court. The nature and scope of argument that will be permitted in a cause is largely within the discretion of the presiding judge. It is the duty of the court to see that the bounds of propriety are not transgressed, but an appellate court will only interfere when a gross abuse of discretion is made to appear. *Cook v. Doud,* 14 Colo. 483.

*Seventh:* The next error assigned relates to the use of the

telephone by one of the jurors after the jury had retired for deliberation. The misconduct claimed was first brought to the attention of the district court upon the motion for a new trial. It appears to have been submitted upon affidavits filed by both parties. As neither the motion nor the affidavits are preserved in the bill of exceptions it must be presumed that the motion was properly overruled. *Rutter et al. v. Shumway*, 16 Colo. 95; Thompson & Merriam on Juries, sec. 434, (2) ; *Gill v. The People*, 42 Ills. 321 ; *Cochlin v. The People*, 93 Ills. 410.

The uncontradicted evidence discloses that the prisoner, although generally a sober man, was in the habit at intervals of indulging in protracted sprees ; that shortly prior to the homicide he was employed at one of the smelters in the city of Denver ; that one John Skillman was in the immediate charge as foreman over this man and others working with him ; that on Saturday previous to the homicide the prisoner was drinking heavily and was late in going to his work on Sunday morning, and that when he reached the smelter he found that he had been discharged by Skillman and another man put in his place. Becoming angered at this he made some threats at the time, but soon left the smelter. He continued his drinking during Sunday and the following Monday. Some time Monday he purchased a pistol at one of the stores in the city and loaded the same. At six o'clock in the evening he again appeared at the smelter for the avowed purpose of killing Skillman. He was at the time brandishing this pistol, and repeatedly threatened to kill Skillman. Upon learning that Skillman was not at that time at the smelter, he fired two shots at other parties.

The deceased, Gus Gisin, was at the time employed about the smelter as a watchman. Other employees becoming alarmed at the actions of plaintiff in error, notified Gisin, who was out of the building at the time, that there was a man down at the smelter making trouble. The circumstances at the particular moment of the shooting are admittedly cor-

rectly given in the following *ante mortem* statement of the deceased, which was admitted in evidence without objection.

Statement of Gustavus Gisin.

" About seven o'clock the night foreman came in and told me that a man was trying to shoot the day foreman, John Skillman. I says, ' Let me go and get my gun.' The night foreman says, ' I will go with you.' I only had a jacket on in the boiler room, and put my coat on so I could put the gun in the side pocket to have it handy. I then went over to the new building and met a man at the entrance ; he had a revolver in his hand threatening around. I went up and said, ' What is the matter with you, my friend ? ' I talked as pleasant and kind as I could, because he had advantage of me. I tried to quiet him down. Did not seem very drunk. Could control himself if he wanted to. Told me he wanted to kill John Skillman, the day foreman. I was very close up to him. He said, ' Get away or I will kill you.' I then tried to walk away ; he told me to stop ; I could not then move. I turned around again and talked nicely to him and told him the position he was putting himself in. He then raised up his gun and shot me."

After the shooting plaintiff in error went out of the building and was found a few minutes later between some railroad cars on the tracks in the vicinity of the building. Upon being called upon by the officer to surrender it was noticed that he threw away something that he had in his hand, and then surrendered. The article thrown away was identified as the pistol with which the crime was committed. After his arrest he refused to talk with reference to the occurrence until he had consulted with an attorney. These facts are uncontradicted. In defense it is shown that the prisoner and the deceased were friends, and it is urged that the intent necessary to constitute murder of the first degree did not exist in the prisoner's mind at the time the fatal shot was fired. The instructions contain a full and fair exposition of the law. In these the different grades of homicide and the distinguishing features of each are clearly set forth. The jury returned

a verdict of murder of the first degree.   The evidence war-
rants the verdict and we cannot interfere with the judgment.
It is accordingly affirmed.

*Affirmed.*