**STATE of North Dakota, Respondent,**

**v.**

**Rodger LOYLAND, Defendant and Appellant.**

**Cr. 330.**

Supreme Court of North Dakota.

March 30, 1967.

Rehearing Denied April 14, 1967.

Letnes, Murray & Quigley, Grand Forks, for appellant.

Helgi Johanneson, Atty. Gen., Bismarck, and John Alphson, State's Atty., Grand Forks, for respondent.

ERICKSTAD, Judge (on reassignment).

This is an appeal from the final judgment of the County Court of Grand Forks County upon the conviction of the defendant, Rodger Loyland, of the crime of aggravated reckless driving and from the order of that court denying the defendant's motion for a new trial. The judgment was based upon a verdict of guilty rendered by the jury. It provided that the defendant should be imprisoned in the county jail for a term of six months, that he should pay a fine of $500 and costs of $500, and that in default of the payment of said fine and costs, he should be imprisoned in the county jail for the further period of 250 days.

The charge arose from a collision between a 1956 model Ford automobile driven by Mr. Loyland and a Comet automobile driven by Terry Ciulacz which resulted in injuries to and the death of Miss Rozanne Davis, a passenger in the Comet. At the time of the collision Mr. Loyland was driving the Ford in a northerly direction on U. S. Highway 81, entering the city of Grand Forks, and Mr. Ciulacz was driving the Comet in an easterly direction on a road which intersects Highway 81 at the edge of the city. The collision occurred at about 2:10 a. m. on April 4, 1965, at the intersection of the gravel road, known as 32d Avenue South, and Highway 81. At that point Highway 81 was divided, with double lanes on each side of the divider. There were stop signs at the west and east edges of the highway, and at the dividing line between the double-lane divided highway was a yield sign. Approximately 1,600 feet south of the intersection on Highway 81 was a sign which limited the speed of vehicles entering the city from the south to 40 miles per hour.

The complaint alleged that Mr. Loyland had willfully and unlawfully operated a motor vehicle "in wanton disregard of the rights and safety of others, and in a careless and heedless manner, and without due caution and circumspection and at a speed and in a manner to endanger or likely to endanger any person or the property of another, upon a highway of this state," and that by reason of such reckless driving he had caused and inflicted injury upon the person of another, all in violation of § 39–08–03, N.D.C.C.

The bill of particulars alleged that the State intended to prove that Mr. Loyland drove a vehicle upon a highway of the state without due caution and circumspection and at a speed or in a manner so as to endanger or be likely to endanger any person or the property of another. In so doing the State stressed that it intended to prove a violation of Subsection 2 of § 39–08–03, N.D.C.C.

In a supplemental bill of particulars the State said:

That the defendant had consumed alcoholic beverages before the offense charged and that the State will submit evidence for the jury to weigh in its determination as to whether or not this was a contributing factor which would tend to fulfill the charge of aggravated reckless driving.

The pertinent part of § 39–08–03 reads as follows:

39–08–03. Reckless driving—Penalty. —Any person shall be guilty of reckless driving if he drives a vehicle upon a highway:

1. Carelessly and heedlessly in willful or wanton disregard of the rights or safety of others; or

2. Without due caution and circumspection and at a speed or in a manner so as to endanger or be likely to endanger any person or the property of another.

* * * Any person violating the provisions of this section, who by reason of reckless driving as herein defined, causes and inflicts injury upon the person of another, shall be guilty of aggravated reckless driving * * *. North Dakota Century Code.

A verdict of guilty was returned by the jury on September 23, 1965. On September 30, 1965, the day set for sentencing, Mr. Loyland moved that the court set aside the jury verdict on the ground of insufficiency of the evidence, or in the alternative that a new trial be granted. He orally argued in support of this motion. On October 5, 1965, he filed written specifications of error in addition to the orally stated specifications of error which were presented on September 30, and on October 7 the court heard oral argument on behalf of the State and of Mr. Loyland. Following the denial of the motion Mr. Loyland has appealed

In his brief on appeal he has included the specifications of error which were designated "additional specifications of error," previously alluded to; these are fifteen in number. In his brief on appeal he also asserts thirty-four "specifications of error."

In argument in the brief he seems to have restated the specifications of error; in any case he has failed to follow the order contained in any of the written specifications. We shall therefore attempt to meet the points as they are raised in the section of his brief designated "Argument."

Assignments of error not argued in the brief are deemed abandoned. See: State v. Hanson, 73 N.W.2d 135 (N.D. 1955); State v. Tjaden, 69 N.W.2d 272 (N.D.1955); State v. Nagel, 75 N.D. 495, 28 N.W.2d 665.

We shall set forth in summary fashion the evidence on which the verdict was based. The evidence on behalf of the State was submitted through the testimony of nine witnesses. Only one witness was

called on behalf of Mr. Loyland, who did not testify in his own behalf.

The first witness called on behalf of the State was Lloyde Richmond of Grand Forks, a registered surveyor and professional engineer. It was through Mr. Richmond that Exhibit 1 was offered and was received by the court without objection. This exhibit is a drawing of that part of Highway 81 where the collision took place. It consisted of two parts, one part being drawn to a larger scale than the other part.

The next witness called by the State was Kenneth Hackenson. He gave the Grand Forks Air Base as his address. He testified that at approximately 2:10 a. m. on April 4, 1965, he was driving from the Boeing Park Trailer Court toward the intersection where the collision occurred. (This trailer court is also known as the President Park Trailer Court or the President Trailer Court.) He said that at that time he saw a black Comet approaching the intersection from the other side of Washington Street (which is Highway 81) and that it stopped at the stop sign and then started across the street.

He stated that he then looked down Washington Street, where he saw the headlights of a car about two blocks away. He said that it was traveling over 60 miles an hour, and that when it hit the Comet as the latter crossed the highway, the Comet spun. His words, in describing the impact, were that "the Comet just lifted in the air." He described the car that came from the south as a Ford and said that after the impact, it went way past the Comet and landed on the other side of the water in the ditch.

After the collision he drove his car into the service road, told his girl friend to go and call the police and the ambulance, and got out of the car and ran down into the ditch, where he found Terry Ciulacz splashing in the water. He pulled him out of the water and then went up to the Comet, where he found a girl lying beside the car. He said he checked to see if she was breath-

ing and that he didn't believe she was breathing at that time. He said that he then started in the direction of the other car, where they were yelling for help, but at that time a truck stopped, so he went to the truck driver and told him to go down to the people in the other car. He then went back and stayed with Mr. Ciulacz. He testified that when the police came and his girl friend returned with the car, the police asked him to take three of the passengers from the Ford to the hospital because there was no ambulance available at that time, and that he then took two girls whom he could identify and a boy whom he could not identify to the hospital.

He stated that it was a clear night, but that the roads were wet and slushy, with approximately an inch of slush on the road, and that it had snowed and rained earlier in the day. He could not say whether the point of impact of the two vehicles was in the east or west lane of the northbound side of the highway but said that it was on the south side of the east-west road and on the east half of the divided highway (thus on the northbound traffic side of the highway).

He said his passenger was Miss Sandra Klang, twenty-three years of age, and that at the time of the accident they were leaving the trailer court, where they had been visiting a friend and playing cards. He said that when he first saw the Ford approaching, they were approximately 40 feet from the intersection. He could not say whether the Comet stopped for the yield-right-of-way sign in the center of the highway because he was looking at the lights of the other car at that time. He described the distance from the highway to the trailer court as about 100 feet. He said he was traveling at approximately 15 miles per hour as he approached the intersection. He stated that he was about 10 to 20 feet from where he turned out of the trailer court when he first saw the Ford and that this would be about 90 feet from the highway; that he traveled about 50 feet more before the impact; and that he was about

40 feet from the accident scene when the collision took place. When asked how long an ordinary city block was, he said about 200 to 250 feet. When cross-examined if it was his testimony that he moved his vehicle about 40 feet while the Ford moved 500 feet, he answered that that was approximately so.

The third witness called by the State was Miss Sandra Klang of Grand Forks. She testified that she was with Mr. Kenneth Hackenson when the two of them left the trailer court in Mr. Hackenson's car. Parts of her testimony describing the accident follow:

A. * * * He had stopped for the stop sign and then he pulled out and after he pulled out, he was hit.

Q. What did you see then? What did you see before he got hit?

A. Just before he got hit, I saw the headlights of the car coming from the south going north.

Q. Would you describe what you saw?

A. The car was hit and it flew up into the air.

Q. No, before the car was hit.

A. Before? He was going real fast. I didn't see it too very much before the car hit.

Q. In your opinion what speed was this car travelling?

MR. LETNES: Just a minute, your Honor, we would object to this question on the grounds no proper foundation, no showing that this witness can give estimates of speed.

THE COURT: The objection will be overruled.

A. He was going real fast. I would say over sixty but as to how much further I wouldn't know.

Q. But you would say he definitely was not going less than sixty?

A. Yes, sir.

Q. What lane was the Ford in?

A. I can't say because I didn't see him.

Q. I mean what lane do you think the accident happened on?

A. It happened approximately in the center.

Q. Approximately in the center?

A. Yes, sir.

Q. What was the weather like this night?

A. It had snowed earlier and then it rained and then it cleared up.

Q. What was the road condition?

A. They were real slippery.

Q. Did you hear anything before the accident?

A. Yes. There was a real loud crash as the cars * * *

Q. Did the Comet stop at the middle, Miss Klang?

A. I can't say for sure. I know he was going real, real slow.

Q. Approximately how fast would you say he was going?

A. Almost at a standstill. Just—he was pulling from the stop sign to come over.

Q. After the—well, what happened to the cars after they collided?

A. The black one, well, that was the Comet. That I noticed afterward. Flew up in the air. It appeared to spin around about three times. There were sparks flying. He ended up in the ditch on the east-hand side of the road.

She said that when Mr. Hackenson took the three people to the hospital, the two women got in the front seat with him and the boy got in the back seat with her. When asked if the boy was referred to by name at any time while she was in the car, she said yes, that one of the girls was named JoAnn and that this girl spoke and called him by the name of Roj. She was asked: "Did you smell anything on this boy?" and she answered: "Yes, there was alcohol."

When the assistant state's attorney attempted to ask a further question concerning the smell of alcohol, specifically, "Where did you smell this in respect * * *," an objection thereto was sustained.

At this point Miss Klang was excused, subject to being recalled, and the State then called Miss JoAnn Ekren of Grand Forks. She testified that she owned the 1956 Ford which was driven by Mr. Rodger Loyland at the time of the collision.

Miss Ekren testified that she was taken to the hospital in a car, that she was seated in the front seat, that Rodger was seated in the back seat, and that Rodger was the same person she had identified as the defendant, Rodger Loyland.

When Miss Klang was recalled, she testified that after sitting next to the person called Roj, she had the smell of alcohol on her clothing when she returned home. The specific statement follows: "It was on our clothing when we returned home to the house."

At this point a motion was made to strike the testimony on the grounds that it was immaterial, irrelevant, prejudicial, and without foundation. A motion was also made for mistrial. The court sustained the objection to the testimony but overruled the motion for mistrial, and the jury was instructed to disregard the answer of the witness. When the jury was so admonished, counsel for Mr. Loyland withdrew the motion for mistrial.

Miss Klang further testified that the one called Roj "passed out" in the car while they were driving to the hospital, and that he was quiet and complained of chest pains before he passed out.

When Miss Klang was cross-examined, she estimated the distance between the trailer court and the highway as being not more than half a block and estimated the length of an average city block to be three or four hundred feet. She did not notice the Ford approaching from the south until just before the collision. Part of the cross-examination follows:

Q. And you say he was going real fast and that he definitely was not going less than sixty miles an hour? Is that your testimony?

A. Yes, sir.

Q. And you—in two seconds, you were able to determine that is the speed he was moving at? Is that your testimony?

A. I could just see him just go like he was shot out of a gun and then the cars hit and * * *

Q. But what I am getting at, Miss Klang, did you see him long enough to determine speed? That is my question.

A. I would say so, yes.

Part of her testimony on cross-examination concerning the approach of the Comet reads as follows:

Q. But, as you recollect it, though, I believe you said the car was moving from the time it stopped at the stop sign until the impact came?

A. Yes, but when he come to that part with the yield-right-of-way—but it seemed like he stopped, but I can't say for sure that he did.

Q. Anyway, he was going real slow?

A. Yes, sir.

She further testified that the two cars came together approximately in the middle

of the east side of the divided highway. She agreed with Mr. Hackenson's marking on State's Exhibit 1 as the approximate point of impact. As for the weather, she testified that it had snowed and rained earlier and then cleared up, and that the roads were "awfully slippery." On re-direct examination Miss Klang testified that she would estimate the speed of Mr. Loyland's vehicle at a minimum of approximately 60 miles per hour and a maximum of approximately 80 miles per hour.

The next witness called by the State was Mr. Terry Lee Ciulacz, who gave his address as the President Trailer Court, Grand Forks, and his age as eighteen.

Part of his testimony reads as follows:

Q. And as you approached Washington Avenue, what happened?

A. I stopped at the stop sign, proceeded across, looked to my right and saw nothing and then—the accident.

MR. LETNES: What was that? Looked to your right and what?

WITNESS: Looked both ways.

Q. Would you tell the jury who else was in the car with you?

A. Rozanne Davis.

Q. Now, when you came to the yield-right-of-way, what did you do?

A. I slowed down.

Q. Did you stop?

A. I can't remember.

Q. Did you look to the right?

A. Yes, sir.

Q. Did you see anything?

A. No, sir.

Q. And then where were you planning on going?

A. Home.

Q. You were going to go straight across Washington?

A. Yes.

Q. Can you recall where the collision took place?

A. No, sir.

Q. Did you see anything of the car that hit you?

A. Just the lights.

Q. When did you first see them?

A. Just before the accident.

Q. Just a split second before the accident?

A. Yeah.

When Mr. Ciulacz was asked what injuries he sustained in the accident, counsel for Mr. Loyland read into the record the following statement:

Your Honor, at this time the defendant Rodger Loyland, stipulates and agrees that Rozanne Davis died as a result of injuries sustained when a vehicle driven by Rodger Loyland collided with a vehicle driven by Terry Lee Ciulacz and that JoAnn Ekren, Mrs. Floyd Anderson and Joseph Mitzel and Rodger Loyland, Terry Ciulacz, were injured as a result of this same collision.

Later the trial court permitted Mr. Ciulacz to testify concerning his injuries at which time he answered as follows:

The injuries that I received were six ribs, each broken in two places, and multiple cuts and lacerations about my face, broken teeth, lacerations to the back, and cuts throughout my body, bruises.

On cross-examination he testified concerning the weather as follows:

Q. All right. How was the weather that night?

A. It seemed bad to me.

Q. It seemed bad? Well, you have heard the other witnesses testify, have you not * * *.

A. Yes, sir.

Q. (Cont'd) * * * Terry?

A. Yes, sir.

Q. Do you disagree with their statement that the weather was clear?

A. No, sir. It was just, to me, it seemed bad.

Q. When you say bad, will you please describe that for the jury?

A. A drizzle.

Q. Was it drizzling at the time of the accident?

A. Yes, sir.

Q. It was?

A. Yes.

Q. So you would not agree with the other two witnesses that said it was clear?

A. No, sir.

Q. All right, now, Terry, will you tell us what the visibility was?

A. It is hard to say. I could see the lights of town.

Q. You could see the lights in town?

A. Yes, sir.

Q. All right. Now, Highway 81 is level at this intersection, is it not?

A. Yes, sir.

Q. And was on that day?

A. Yes, sir.

Q. And at least in daylight, you could see for several miles to the south; isn't that correct?

A. Yes, sir.

Q. It is just flat prairie, isn't it?

A. Yes, sir.

He said he had no memory of the other car approaching from the east.

The next witness called by the State was Duane Johnson, a detective of the Grand Forks Police Department. He stated that he had been employed by the police department for a little over eight years. He testified that shortly after the collision he took various photographs at the scene of the accident, including pictures of the two vehicles, and it was through his testimony that a number of photographs were received in evidence as exhibits. Exhibits 2 and 3 were photographs of the Ford, taken at the scene of the accident, disclosing extensive damage to the front end. Exhibit 6 was a photograph of the right side of the Comet, disclosing extensive damage from the front door to the rear. This photograph also showed what appeared to be the body of a person lying on the ground near the opened right front door of the Comet. Exhibit 5 was a photograph of the left side of the Comet.

The next witness called by the State was Mr. Robert Thomas Corbett, a patrolman of the Grand Forks Police Department. He stated that he had been employed by the police department about a year and a half. He testified that at approximately 2:12 a. m. he and Officer Bangle, after being informed of the accident, went to the scene of the accident. After helping to secure transportation for the injured, he and Officer Bangle went to St. Michael's Hospital, where they entered the emergency room and found Mr. Loyland and others. When Officer Corbett was asked how Mr. Loyland appeared to him, an objection was made which was overruled, and he answered:

His appearance, to me, and his physical condition was that he—and his breath, that he was under the influence of alcohol.

Counsel for Mr. Loyland then moved to strike the answer on the grounds that it was

not responsive and gave a conclusion not supported by foundation. This motion was granted, and the jury was instructed to disregard the answer.

Officer Corbett testified further concernin Mr. Loyland's appearance as follows:

Q. Would you describe Rodger Loyland's eyes on this evening?

A. They were bloodshot.

Q. Would you describe his breath?

A. His breath smelt of alcoholic beverage.

Q. Would you describe his manner of speech?

A. His speech was a little slurry, I would say. It was not normal speech.

Q. Did you see Rodger Loyland walk?

A. I had seen him walk, but there was so much confusion in this emergency room.

He stated that after leaving the hospital he returned to the scene of the accident and later, at about 5:00 p. m., he received a call from St. Michael's Hospital from which he learned that Mr. Loyland "had taken off from the hospital." Counsel for Mr. Loyland moved that this answer be stricken. The motion was granted and the jury was instructed to disregard the answer.

Officer Corbett further testified that it was drizzling that night and that there was approximately two inches of sleet on the road; that the speed limit in the area where the accident occurred was 40 miles per hour; that south of the 40-mile-per-hour speed limit sign there was a sign limiting the speed to 45 miles per hour; that 32d Avenue South is the city limit; and that to the south the highway is flat, with no dips or hills.

The next witness called by the State was Mr. Larry Bangle, a police officer with the Grand Forks Police Department. He stated that he had been employed by the police department for 4½ years. He estimated the visibility at the time he was driving to the scene of the accident at one half mile. When he was about to testify in connection with the State's Exhibit 1, the drawing of the scene of the accident, the assistant state's attorney said:

You can—wait a minute. I hand you State's Exhibit 13, which is your accident report, which you may use to help yourself.

At that point counsel for Mr. Loyland objected and, after withdrawing to the court's chambers, made a motion for mistrial, apparently on the ground that this information could not be used by the police officer even to refresh his memory, under the provisions of § 39–08–14, N.D. C.C.

The court sustained the objection but denied the motion for a mistrial. Later the court permitted Officer Bangle to refresh his memory from a memorandum which consisted of notes that he had taken at the scene of the accident. The court overruled an objection to the officer's refreshing his memory from these field notes, holding that the prohibitions contained in § 39–08–14 did not extend to field notes.

Officer Bangle testified that he established a base point for his measurements, that being the first concrete splice north of the center of the intersection of 32d Avenue South and South Washington Street, and that he found the distance from the base point to the back wheel of the Comet to be 98 feet, to the front wheel of the Comet to be 104 feet, and to the back wheel of the Ford to be 318 feet. He estimated the distance from the point designated on Exhibit 1 by other witnesses to have been the point of impact to be approximately 30 feet from his base point, so that 30 feet would have to be added to his measurements to show the distance the vehicles traveled from the point of impact.

The vehicles came to rest to the north of the intersection.

He drew a large circle in the intersection as shown on State's Exhibit 1 to indicate that he found glass within that area and said he found no evidence of skid marks leading to the point of impact. When he was asked what he saw upon the front seat or upon the floor of the Ford, an objection was made that there was no foundation for such a question. This objection was sustained. When he was asked what he saw when he looked into the car, the same objection was made; but this objection was overruled, and he answered that on the driver's side on the floorboard was a can of beer, and that he observed a full can of beer on the back seat. Motion was then made by counsel for Mr. Loyland to strike the testimony on the ground that it had nothing to do with the proof of the offense, and this motion was overruled.

He then testified that one of the cans was open, that it contained liquid, and that it was covered with blood. He stated that printed on the outside of the can was the word "Schlitz." Later the witness was shown two cans and was asked if the cans, State's Exhibits 14 and 15, were the cans that he found, and he answered that they were, that both of those cans were in the back seat, and that the can from the floorboard of the front was not brought into court because it was empty. When Exhibits 14 and 15 were offered in evidence, they were objected to on the ground that there was no foundation because there was no showing that the presence of the cans in the car had anything to do with the alleged offense. This objection was sustained, and, upon withdrawing to chambers, counsel for the defendant moved for a mistrial on the ground that prejudicial error had been committed in permitting the officer to testify that he found the cans in the car without showing any connection or showing that the contents of the cans had been partaken of by Mr. Loyland. This motion was also denied.

Officer Bangle estimated the distance from the trailer court to the intersection to be a city block and estimated a city block to be 350 feet. He said that there was slush on the road; that it was foggy; that the visibility was down to half a mile; that there was a slight mist falling at the time; that all the damage done to the Comet was done on its right side; and that there was nothing to indicate to him that the cars had spun around and collided with each other, going in a circle.

The next witness called by the State was Mr. Leo Novacek of Grand Forks, administrative assistant to the state's attorney's office. He testified that in the early morning hours of April 4, 1965, he participated in the investigation of the collision, and that in so doing, he took measurements of several traffic control signs leading from the south to the intersection. He said that in a southerly direction on Highway 81 from the intersection he found a "Divided Highway" sign, triangular in shape, at 1,521 feet; that proceeding further, at 1,629 feet he found a rectangular sign which read, "Speed Limit 40"; that proceeding further, at 1,820 feet he found a diamond-shaped sign which read, "Road Construction 1,000 Feet"; that proceeding further, at 2,242 feet he found a diamond-shaped sign which read, "Road Construction Ahead"; and that proceeding further, at 2,760 feet he found a rectangular sign which read, "Do Not Pass." He took photographs of these signs, and these photographs were introduced and received in evidence. On cross-examination he conceded that there was no construction in existence at the time of the accident.

The only witness called on behalf of Mr. Loyland was Sister Joseph Adele, who testified that on April 4, 1965, she was the head nurse of the medical-surgical unit of St. Michael's Hospital in Grand Forks. She said that on the morning of April 4, 1965, she had occasion to see Rodger Loyland in the emergency room, which is located on the first floor of the hospital, and that this was sometime between 2:00

and 4:00 in the morning and within an hour after his admission to the hospital. After being asked if she was familiar with the odor of alcohol and answering in the affirmative, she testified as follows:

Q. Now I ask you, Sister Adele, did you smell any alcoholic beverage on or near the person of Rodger Loyland.

A. No, sir.

Q. And how close were you to him at any time, given time?

A. I was standing right in front of him.

Q. Sister Joseph Adele, did you observe his manner of speech?

A. Yes, sir.

Q. And what was your observation?

A. It was plain and distinct.

Q. Plain and distinct?

A. Yes, sir.

Q. Did you observe slurring in his speech?

A. No, sir.

Q. Was there any alcoholic smell on his breath?

A. No, sir.

Q. I will ask you, Sister Joseph Adele, whether or not he was cooperative?

A. Yes, he was.

Q. Did Rodger Loyland do anything which was not done in a pleasant manner?

A. No, sir.

Q. Did he appear to know where he was and what was going on?

A. Yes, sir.

MR. LETNES: That is all. Thank you, Sister.

On cross-examination she stated that she drew blood from his left arm and that she did not know at the time for what purpose she took it, but that she later discovered it was for the purpose of making a blood alcohol test; and that in taking the blood, she made a mistake, because she took it without the patient's permission and also because she mistakenly used an alcohol swab. When asked if she smelled the alcohol from the swab, she said that she probably did but that she was not aware of it at the time because she was so used to using alcohol swabs for injections and punctures.

When asked if it was not a fact that the defendant later ran away from the hospital that evening, she said:

A. Sir, I am not aware of Mr. Loyland getting out because I did not see him.

Q. You did not hear anything around the hospital to this effect?

A. No, sir.

The first contention made by Mr. Loyland in argument in his brief is that the trial court erred in failing to advise the jury to acquit the defendant pursuant to § 29–21–37, N.D.C.C. In support of this contention he states that, aside from some testimony indicating speed of the defendant's vehicle in excess of the 40-mile-per-hour posted speed limit, there was no evidence of improper driving on the part of the defendant. He concedes that there was some testimony given which tended to prove that the defendant was under the influence of alcohol at the time of the alleged offense but states that no charge of driving while under the influence of intoxicating liquor was ever laid against the defendant; that no medical proof was introduced tending to prove intoxication on the part of the defendant; and that, on the contrary, testimony was given by Sister Joseph Adele, the registered nurse at St. Michael's Hospital, that showed that there was no evidence of an alcoholic odor on the person of the defendant and no evidence of his intoxication.

At this point it should be noted that Mr. Loyland also alleges as error the trial court's denial of the motion to set aside the verdict on the ground of insufficiency of the evidence to support the verdict, or in the alternative for a new trial.

■ As we have said previously, in passing upon a motion for a new trial based on the insufficiency of the evidence, the trial court is clothed with a wide discretion, and its determination with respect to such sufficiency will not be disturbed unless there appears to have been an abuse of that discretion. State v. Carroll, 123 N.W.2d 659 (N.D.1963).

■ The same rule should apply to a motion to set aside the verdict on the ground of insufficiency of the evidence if such a motion is permissible. In this case we find it unnecessary to determine whether such a motion was permissible.

In discussing our responsibilities on an appeal in passing upon a motion based on the insufficiency of the evidence, we said:

In another case based upon circumstantial evidence, State v. Moore (N.D.), 101 N.W.2d 579, this court repeated the above proposition and then quoted from People v. Newland, 15 Cal.2d 678, 104 P.2d 778, at 780, where the court quoted from People v. Martinez, 20 Cal.App. 343, 128 P. 952, as follows:

" 'Where the circumstances are such as to reasonably justify an inference of guilt, as found by the jury, the fact that an inference of innocence might likewise be reasonably drawn therefrom does not present a question of law for review by an appellate court any more than does a verdict based upon direct conflicting evidence. In neither case will the verdict be disturbed. * * *' "

State v. Carroll, 123 N.W.2d 659, 668.

■ In this case there is conflicting testimony concerning the odor of alcohol about the person of Mr. Loyland and his appearance and speech. The jury had the benefit of seeing and hearing the witnesses and considered the testimony of all of the witnesses in respect to all of the evidence; and it came to the conclusion that the defendant was guilty of the crime of aggravated reckless driving. Viewing the evidence which has been set forth herein and other evidence contained in the record, we are of the opinion that there is evidence to support the verdict and thus find no abuse of the trial court's discretion in its denial of the motion to set aside the verdict on the basis of insufficiency of the evidence, or in the alternative for a new trial. As was intimated by this court in *Carroll* in quoting Corpus Juris Secundum, we are not required to explain the process by which the jury arrived at its determination.

State v. Carroll, supra, 123 N.W.2d 659, 669.

It is the contention of Mr. Loyland that the only evidence going toward the proof of reckless driving was the evidence of the high rate of speed or the speed in excess of the legal limit, and that this is not alone sufficient to sustain a conviction. In support of this contention he cites People v. Carrie, 122 Misc. 753, 204 N.Y.S. 759; and State v. Sullivan, 58 N.D. 732, 227 N.W. 230.

Our statute on advised verdicts reads as follows:

29–21–37. Court may advise jury to acquit.—If, at any time after the evidence on either side is closed, the court deems it insufficient to warrant a conviction, it may advise the jury to acquit the defendant, but the jurors are not bound by the advice, nor can the court, for any cause, prevent the jury from giving a verdict. North Dakota Century Code.

■ In State v. St. Croix this court said: * * * The next assignment is predicated on the trial court's denial of defendant's motion for an advised verdict made at the close of the state's case and renewed at the close of all of the evidence. Clearly there was no error in these rulings. Our statute, Sec. 29–2137,

NDRC 1943 provides that the court "may advise the jury to acquit the defendant, but the jurors are not bound by the advice, nor can the court, for any cause, prevent the jury from giving a verdict." We have held in numerous cases that error cannot be predicated on the denial of such a motion. Among the cases so holding are: State v. Wright, 20 N.D. 216, 126 N.W. 1023, Ann.Cas.1912C, 795; State v. Thompson, 68 N.D. 98, 277 N.W. 1; State v. Dimmick, 70 N.D. 463, 296 N.W. 146; and, State v. Seeb, 76 N.D. 473, 37 N.W.2d 341.

State v. St. Croix, 79 N.D. 269, 55 N.W. 2d 635, 637.

State v. Sullivan does not hold that evidence of speed alone is not sufficient to sustain a charge of reckless driving. In that case the complaining witness was the driver of an automobile with which, it was alleged, the defendant, driving another automobile, collided. The court said:

* * * The defendant claims that the testimony shows the complaining witness was guilty of reckless driving, was the real cause of the accident; that he himself was not guilty of reckless driving. On the other hand, the witness for the state shows that the defendant appeared to be drunk; they smelled liquor from his breath; he had the appearance of a man under the influence of liquor; that he was driving in a way utterly regardless of the rights of others; that the place of the accident was such as to show conclusively he was on the wrong side of the road in an attempt to pass another automobile and swung into the complaining witness who was as near to the outside of his side of the road as he could conveniently get. Of course both parties may have been guilty of reckless driving, but this would not excuse the defendant. There was sharp conflict of testimony, but there is ample evidence in the record to find the defendant guilty of reckless driving as charged in the information, and all in all it was for the jury to say what weight they would give to the testimony of the witnesses. Where there is evidence sufficient to sustain the finding of the jury, even if it be contradicted by other testimony, and it is not clearly against the weight of the evidence or not unreasonable, this court will not interfere, especially where the presiding judge hears and denies a motion for a new trial, based, in part at least, on the same ground.

State v. Sullivan, 58 N.D. 732, 227 N.W. 230, 232.

■ We believe that this answers the argument of Mr. Loyland in which he seeks to be absolved by contending that it was the recklessness of Mr. Ciulacz in driving his car through the yield sign that was the proximate cause of the accident, for, as said in *Sullivan,* it is evident that the recklessness of one will not excuse the recklessness of another in a prosecution of one for the offense of reckless driving.

The only statement in *Sullivan* which in any way resembles what Mr. Loyland asserts that case holds is the following:

Reckless driving may be based entirely upon violations of the rules of the road and negligence, though all cases of such violation or of negligence may not be reckless driving.

In People v. Carrie, 122 Misc. 753, 204 N.Y.S. 759, the other decision cited by Mr. Loyland, the statute under which the defendants were prosecuted and the facts surrounding their arrests are so different from the facts and the statute in this case that the decision can be of no value to us as precedent.

In that case the defendants, Carrie and Levi, were charged with having violated § 14, subdivision 2, of the General Highway Traffic Law of the State of New York. That statute read as follows:

Upon approaching a bridge or in passing a public hospital, fire house or a school the driver of any vehicle or street surface car shall proceed with extreme care and with vehicle or street surface car under control, provided local au-

thorities have legible and visible signs posted, warning drivers of their approach to a bridge, fire house, public hospital or school building.

The facts were that Carrie, at about 2:30 a. m. on November 28, 1923, while going in a northerly direction through the village of Kenmore in his automobile, traveled at about 45 miles per hour, and that Levi, on the following day at about 3:30 a. m., traveled over the same road at about 48 miles per hour. The court said that other than the police officers who made the arrests, there was absolutely no other traffic on the highway; that along that stretch of road there were no sidewalks, no intersecting streets except one which came in from the east, only one or two buildings on one side of the road and eight on the other side; and that there were no pedestrians on the road.

Under that state of facts the court said that the State had failed to prove any facts which showed a violation of the statute.

On examination of the annotation in 52 A.L.R.2d also cited by Mr. Loyland, we note the following statement:

In the absence of a statute or ordinance denouncing as reckless driving the operation of a motor vehicle at an excessive or imprudent rate of speed, the mere speed at which a motor vehicle was operated does not alone determine whether it was operated recklessly, but is only a circumstance to be considered in connection with the surrounding circumstances in determining the question. * * * Annot., 52 A.L.R.2d 1337, 1361 (1957).

Following that statement the writers of the annotation include our case of State v. Sullivan, supra, among the cases they say are in support. The annotation refers us to 86 A.L.R. 1283. That reference follows:

In State v. Sullivan (1929) 58 N.D. 732, 227 N.W. 230, the court said that a man might observe the speed limit and still be guilty of reckless driving by zig-

zagging constantly, so as to endanger others and wantonly interfere with their rights.
Annot., 86 A.L.R. 1273, 1283 (1933).

It is clear therefrom that *Sullivan* does not support the contention made by Mr. Loyland.

Because of the emphasis placed on the annotation contained in 52 A.L.R.2d by Mr. Loyland, we think it is especially important to note §§ 18 and 19 of that annotation.

Under § 18 it is pointed out that under certain circumstances speed may be enough on which to predicate a conviction of reckless driving. Among the cases cited in support of that statement is People v. Nowell, 45 Cal.App.2d Supp. 811, 114 P.2d 81. In that case the court recognized that one may be guilty of the offense of speeding and yet not be guilty of the crime of reckless driving but was nevertheless of the opinion that mere speed may be so excessive as to afford proof of the elements necessary to make out the more serious crime of reckless driving. The following is a pertinent quotation from that case:

* * * If we wished to be pedantic we would note that speed is never "in itself and alone." Of necessity, when referring to the speed of an automobile, there is involved the highway on which it travels, with its width, surface and the presence or lack of traffic upon it. There is involved, too, the factor of visibility; was the car driven before or after dark? When considered in relation to these matters, mere speed, without other acts, may demonstrate wilful misconduct or that the driving is reckless. * * *
People v. Nowell, supra, 114 P.2d 82.

In *Nowell* the court went on to quote an earlier California decision which quoted a still earlier California decision as follows:

* * * We do not wish to be understood as holding that mere speed may never constitute willful misconduct if

indulged in under certain conditions. Willful misconduct, like negligence, must relate to the time, place, person and surrounding circumstances, and must be measured by them. Excessive speed under some circumstances may amount to negligence, under others to gross negligence, and under still others to willful misconduct.

In this case it is clear that the jury had before it more than the element of speed alone and that it was proper for the jury to consider the speed that Mr. Loyland was traveling, in light of the other conditions, such as the slush on the road; the reduced visibility; that Mr. Loyland was entering one of the largest cities in the state; that he was traveling upon a highway on which there was other traffic, especially on the intersecting road; that he was traveling at night, when it is difficult to estimate distances; and the other facts brought out during the trial concerning the effect or the influence upon Mr. Loyland of the use of intoxicating liquors.

We believe that what we said in the recent case of State v. Kreiger is also significant. In that case the defendant alleged that in order to convict a person of the crime of reckless driving it was necessary to prove all of the elements of both Subsection 1 and Subsection 2 of § 39–08–03, N.D.C.C.

In syllabus 1 we said:

Any person who is guilty of reckless driving, as defined by either Subsections 1 or 2 of Section 39–08–03, North Dakota Century Code, and who, by reason of such reckless driving, causes and inflicts injury upon the person of another, is guilty of aggravated reckless driving. State v. Kreiger, 138 N.W.2d 597, 598 (N.D.1965).

We are of the opinion that the evidence in this case clearly supports the conviction of the defendant under Subsection 2. This means that the evidence supports the con-clusion that Mr. Loyland drove a vehicle upon a highway of our state without due caution and circumspection and at a speed or in a manner so as to endanger or be likely to endanger the person or the property of another.

A number of cases involving tort actions have been referred to this court in support of Mr. Loyland's contention, but it is our view that because they relate to and determine only civil matters, they are not pertinent.

It seems to be the further contention of Mr. Loyland that the testimony of witnesses Kenneth Hackenson and Sandra Klang is so grossly exaggerated that it cannot be believed. Mr. Loyland asserts that, according to their testimony, Mr. Loyland's vehicle would have had to have been moving approximately 12½ times as fast as the Hackenson vehicle.

Our examination of their testimony shows that they were giving estimates or approximations of speed and time. Complete accuracy in computing distances and speeds is not a prerequisite to the receipt in evidence of this type of testimony, and the weight to be given such testimony is for the jury to ascertain, not this court on appeal.

Mr. Loyland's next contention is that the assistant state's attorney in his opening statement to the jury made remarks which were highly prejudicial. He is especially critical of the following statement:

We will further show by competent evidence that the defendant's car, when pulled out of the ditch where it came to rest, contained empty, full and partially full beer cans.

He points out that when this statement was made, he objected and in chambers moved for a mistrial. The court sustained Mr. Loyland's objection, deeming the dissertation of the state's attorney argumentative in nature, and instructed the jury to disregard the statement. However, it de-

nied the motion for mistrial. Coupled with the contention that this was prejudicial error, reference was made by Mr. Loyland to the fact that the State later attempted to introduce into evidence certain beer cans and did in fact get into the evidence testimony concerning the finding of beer cans, all of which, Mr. Loyland contends, was highly prejudicial.

With this contention we cannot agree.

In State v. St. Croix, supra, Mr. St. Croix had been convicted in district court of the crime of operating a motor vehicle on a public highway while under the influence of intoxicating liquor. On appeal to this court he argued that it was error for the lower court to admit into evidence an open bottle of whiskey which was found by the sheriff in Mr. St. Croix's truck because there was no evidence connecting Mr. St. Croix with the whiskey bottle. In that case this court said:

> We consider first the assignments of error relating to rulings on objections to the admission of evidence. The first one concerns the receipt in evidence of Exhibit 1, the open bottle of whiskey found by the sheriff in defendant's truck. Defendant denies that the bottle was his, that he consumed any of the contents, or that he had any knowledge whatever regarding it until it was shown to him by the sheriff after his arrest. He insists it was error to admit this exhibit in evidence or to permit the sheriff to testify regarding it because he says there is no evidence connecting him with it. It is true there is no evidence that the defendant purchased the bottle or had consumed any of its contents, but it was found in his truck a short time after he had driven the truck from Flaxton to the point where it was stalled in the ditch and the presence of the open bottle of whiskey in the truck at that time was a circumstance the jury had a right to take into consideration in connection with the other evidence in the case in reaching a conclusion as to whether the defendant had

been under the influence of intoxicating liquor when he drove his truck as above related. The objection was properly overruled. If the proffered evidence is relevant to the issue it is admissible. In State v. Isensee, 64 N.D. 1, 249 N.W. 898, 903, we quote from 1 Wharton Ev. 3d Ed. Sec. 21, p. 13: "it is relevant to put in evidence any circumstance which tends to make the proposition at issue either more or less improbable. * * * Whatever is a condition, either of the existence or non-existence of a relevant hypothesis, may be thus shown." And, in State v. Heaton, 56 N.D. 357, 217 N.W. 531, 534, there is this quotation from Thayer, Ev. 2, 3: "If the evidence offered conduces in any reasonable degree to establish the probability or improbability of the fact in controversy, it should go to the jury." The defendant denied having any knowledge of the exhibit until it was shown him by the sheriff and testified that his hired man, Poppin, was a drinking man and had been drinking that day, but Poppin, who could have furnished complete information regarding the ownership of the exhibit and defendant's knowledge or lack of knowledge regarding it was not called as a witness, nor was the failure to call him in any way accounted for. The facts here are somewhat analogous to those in State v. Rickel, 69 N.D. 329, 286 N.W. 895, 897, where we said: "The issue was the condition of the defendant when driving. If he had a bottle half full of whiskey with him in the car at the time of the accident, this could be shown." State v. St. Croix, 79 N.D. 269, 55 N.W.2d 635, 636–637.

The proposition in issue in this case was whether Mr. Loyland had driven a vehicle without due caution and circumspection and at a speed or in a manner so as to endanger or be likely to endanger the person or the property of another. Whether Mr. Loyland had been drinking alcoholic beverages would certainly be material in determining whether he had been driving without due caution and circumspection.

██ It is our view that there was nothing prejudicial in the remarks made in the opening statement nor in the efforts made later to introduce the beer cans in evidence. When the State elicited testimony concerning the beer cans and attempted to introduce the cans in evidence, there had already been testimony that following the collision Mr. Loyland's eyes were bloodshot, that his speech was "slurry," and that the odor of alcohol was on his breath. In our opinion there was no more reason to exclude from evidence the beer cans found in the vehicle driven by Mr. Loyland than there was to exclude photographs of the wrecked automobiles, photographs of the highways, or photographs of the highway signs. The presence of the beer cans in the automobile was a circumstance the jury had the right to take into consideration with all of the other evidence in the case in determining whether Mr. Loyland had operated the vehicle without due caution and circumspection.

Mr. Loyland points out that the following statement was made by the assistant state's attorney in his closing argument to the jury:

Miss Klang further testified that the defendant while seated next to her in the car passed out. There was no testimony put on by the defendant or no witness that stated that the defendant was injured in such an extent that he would pass out. So the only conclusion we can come to from this is that the defendant passed out as a result of liquor.

It is his contention that this statement was prejudicial, and that when his counsel requested that the court and counsel retire to the chambers, presumably so that a motion for a mistrial could be made, the court declined and made the following statement:

The Court sees no reason to retire to chambers at this time. Counsel on both sides are given wide latitude in argument. The Court does not feel it should be necessary to interrupt the State's argu-

ment for the purpose of retiring to chambers at this time. You may proceed, Mr. Moosbrugger.

Although it is Mr. Loyland's contention that all of this was very prejudicial to him, he does not disclose in what respects it was so, nor does he cite any authority in support of his contention.

He also points out that the assistant state's attorney made the following statement to the jury: "Also the defendant's counsel has accused two of the witnesses of perjury."

He contends that this was a prejudicial and improper statement, and that the court, when objection was made thereto, merely stated: "The exception will be noted."

He further complains of the following statement made by the assistant state's attorney in his closing argument: "He also accused Sandra Klang of the same offense of perjury and he accused her of not seeing the cars coming." He asserts that when the court, in response to the objection made by his counsel, merely stated, "The exceptions will be noted. You may proceed, Mr. Moosbrugger. The objection will be overruled," prejudicial error was committed by the trial court which deprived him of a fair trial.

The argument of counsel for Mr. Loyland was not made a matter of record, but it is interesting to note that when the propriety of the assistant state's attorney's statements made in closing argument to the jury was argued on the motion for new trial, he recalled from memory the statements which defense counsel had made in closing argument. It is our view that it was reasonably inferable from what he recalled the defense counsel had said, that defense counsel in effect accused the witnesses of perjury.

Without a record of what was said by the defense counsel it is very difficult for us to determine exactly what happened. This causes us to place great weight on the

determination of the trial court, who was present and, heard the arguments of both counsel and thus was able to better judge the effect of the arguments of counsel upon the jury.

The Supreme Court of Oklahoma follows the rule that error cannot ordinarily be predicated upon mere unexplained excerpts from the argument of counsel when the entire argument of both sides is not before the court. Bell v. State, Okl.Cr., 381 P.2d 167, 174.

In ruling on a claimed error stemming from remarks made in the argument of the prosecuting attorney to the jury in State v. Gibson, this court quoted Syllabus 5 of State v. McGahey, 3 N.D. 293, 55 N.W. 753, as follows:

"The control of the remarks of counsel for the state during a criminal trial is a matter largely in the discretion of the trial court; and where the objectionable remarks are of a general character, and such as would not be likely, under the attending circumstances, to prejudice the cause of the accused in the minds of honest men of fair intelligence, the failure of the court to strike out such remarks, or caution the jury against them, is not such an abuse of discretion as will constitute error." [Citing McGahey.] State v. Gibson, 69 N.D. 70, 284 N.W. 209, 225.

The court went on to say:

It is not claimed in this case that there was a violation of any statutory limitations upon counsel,—such as the inhibition against comment on the failure of the defendant in a criminal action to testify.

"The objections are placed upon broader grounds, and, to support them, it must clearly appear that counsel have stepped beyond the bounds of any fair and reasonable criticism of the evidence, or any fair and reasonable argument based upon any theory of the case that has support in the testimony. This rule was never intended to limit counsel in any manner that could injuriously affect his case upon the merits. He is allowed a wide latitude of speech, and must be protected therein. He has a right to be heard before the jury upon every question of fact in the case, and in such decorous manner as his judgment dictates. It is his duty to use all the convincing power of which he has command, and the weapons of wit and satire and of ridicule are all available to him so long as he keeps within the record. He may draw inferences, reject theories and hypotheses, impugn motives, and question credibility, subject only to the restriction that, in so doing, he must not get clearly outside the record, and attempt to fortify his case by his own assertions of facts * * *. But this matter is, and of necessity must be, largely within the discretion of the trial court, and the action of the trial court should be reversed only in cases of clear and prejudicial abuse of this discretion." State v. Kent, 5 N.D. 516, at pages 559, 560, 67 N.W. 1052, at page 1064, 35 L.R.A. 518. State v. Gibson, supra, 284 N.W. 225.

In a murder trial in which evidence of sodomy had been received, the deputy prosecuting attorney in closing argument in substance asserted that in ancient times in England sodomy was punishable by death and referred to the ancient cities of Sodom and Gomorrah as having been destroyed because the inhabitants practiced acts of sodomy. In finding this conduct on the part of the deputy prosecuting attorney no basis for reversal, the Indiana Supreme Court said:

* * * The conduct of counsel in the presentation of argument to the jury is within the discretionary control of the trial judge in the first instance, and unless there is an abuse of this discretion which is clearly prejudicial to the rights of the accused, the ruling of the trial court should not be disturbed. * * *

Kallas v. State, 227 Ind. 103, 83 N.E.2d 769, cert. denied 336 U.S. 940, 69 S.Ct. 744, 93 L.Ed. 1098.

As Mr. Loyland's contention carries a possible inference that it is only the remarks of the prosecuting attorney that are relevant in determining whether a party has had a fair trial (inasmuch as he has not supplied the court with a record of the remarks made by defense counsel), we believe a 1962 decision of the Supreme Court of Colorado, affirming its earlier rule, is pertinent:

" * * * In view of the frequency with which assignments of error in criminal cases are based upon arguments of the district attorney, we deem it advisable to call attention to the fact, which often seems to be overlooked, that counsel for the state and for the defense stand before the jury on an absolute equality. Each has an equal right to comment upon the facts in the case, and the inferences deducible therefrom, and apply thereto the law as given by the court. The nature and scope of argument that will be permitted in a cause are largely within the discretion of the presiding judge. It is the duty of the court to see that the bounds of propriety are not transgressed, but an appellate court will only interfere when a gross abuse of discretion is made to appear."

Bizup v. People, 150 Colo. 214, 371 P.2d 786, 789, cert. denied 371 U.S. 873, 83 S.Ct. 144, 9 L.Ed.2d 112, quoting Jordan v. People, 19 Colo. 417, 36 P. 218.

For other interesting decisions see: United States ex rel. Langer v. Ragen, 237 F.2d 827, 830 (7th Cir. 1956); Gallegos v. People, 116 Colo. 129, 179 P.2d 272; State v. Norton, 151 Me. 178, 116 A.2d 635.

■ Applying that reasoning, we find no abuse of the trial court's discretion in denying the motions based upon the alleged prejudicial statements of the assistant state's attorney and the alleged prejudicial conduct of the trial court.

Many other errors have been asserted by Mr. Loyland as having prejudiced him and thus deprived him of a fair trial. Some of these alleged errors have been referred to in our summary review of the evidence submitted, and others have not. We have, however, considered each of the specifications of error, whether or not referred to in this opinion, and found them to be without merit. To discuss in detail all of the specifications of error would only serve to unduly lengthen an opinion which has already taxed the patience of some members of this court.

It is our conclusion that on the record presented to us there is no basis for setting aside the judgment and order of the trial court, and for the reasons stated herein both the judgment and the order of the trial court are affirmed.

TEIGEN, C. J., and KNUDSON, J., concur.

PAULSON, J., not being a member of the Court at the time of submission of this case, did not participate.

STRUTZ, Judge (concurring specially).

I concur in the result reached by the majority, but I cannot agree with the long and wordy analysis of the many principles of law which I feel entirely unnecessary to a determination of this case. No possible good can come from the wordy discussion of the majority. It surely will result in confusing anyone who tries to read and apply the law which this decision sets out. We have held many times that this court will consider only the issues which must be passed upon in order to decide the case. After reading the long and needlessly detailed reasoning on the various points of law discussed, I concur wholeheartedly with comments made by Charles A. Beardsley when he wrote, in Volume 26, Journal of the American Judicature Society, page 41:

"But the judges don't stop when they run out of their own words. They cause

their typists to copy paragraph after paragraph, and sometimes page after page, of other judges' words—all of which copied words the lawyers have already bought and paid for and stored on their book shelves."

I concur in the result.