STATE of North Dakota, Plaintiff and Appellee,

v.

Ali MEHRALIAN, Defendant and Appellant.

Cr. No. 723.

Supreme Court of North Dakota.

Jan. 30, 1981.

Thomas M. Disselhorst, Bismarck, for defendant and appellant; argued by Disselhorst and by Duane G. Arndt, Minneapolis, Minn.

Owen K. Mehrer, State's Atty., Dickinson, for plaintiff and appellee.

PAULSON, Justice.

Ali Mehralian ["Mehralian"] appeals from a judgment of conviction entered against him by the Stark County Court of Increased Jurisdiction on April 15, 1980. On November 26, 1979, and on December 6, 1979, criminal complaints alleging the commission of the crime of criminal trespass were filed against Mehralian. These cases were later consolidated for trial. A 12-member jury convicted Mehralian on one charge of criminal trespass, under § 12.1–22–03(2) of the North Dakota Century Code, but found Mehralian not guilty on the second charge of criminal trespass. We reverse the judgment of conviction and remand the case for a new trial.

Ali Mehralian and Jeana Kay Swett ["Jeana"] were married on August 25, 1978, in Minneapolis, Minnesota, while both were students at the University of Minnesota. Jeana's parents, Herbert Darwin Swett ["Mr. Swett"] and Marjorie Ann Swett ["Mrs. Swett"] were not informed of the marriage until April of 1979, when difficulties arose in the relationship between Mehralian and Jeana. Jeana returned to her parents' home in August of 1979 and commenced divorce proceedings. Because of continued difficulties in the relationship, Jeana obtained a restraining order on October 3, 1979, which prohibited Mehralian from interfering in Jeana's activities. Despite these difficulties, Jeana and Mehralian continued to see each other, and Jeana stayed at Mehralian's apartment on several occasions. Sharon Swett ["Sharon"], Jeana's sister, rented an apartment in Dickinson while she worked for various seismograph companies. Sharon had not given Mehralian permission to stay in her apartment, but Mrs. Swett discovered that Mehralian was living in the apartment while Sharon worked in areas outside of Dickinson. On September 8, 1979, Mrs. Swett observed Mehralian sleeping in Sharon's apartment. The relationship between Mehralian and Mr. Swett was strained because he disapproved of Jeana's marriage to Mehralian. On the morning of November 20, 1979, Mehralian is alleged to have entered the home of the Swett family in order to see Jeana. On November 26, 1979, Mr. Swett signed a criminal complaint which stated that Mehralian had committed the crime of criminal trespass under § 12.1–22–03(2), N.D.C.C. A second complaint alleging that Mehralian had committed the crime of criminal trespass was signed by Sharon on December 6, 1979. This second charge was later consolidated with the original charge and the cases were tried on April 1, 1980. The jury found Mehralian guilty of criminal trespass on the charge lodged against Mehralian by Mr. Swett but found him not guilty on the charge lodged against Mehralian by Sharon.

The trial court determined that Mehralian was unable to employ counsel due to his financial circumstances; therefore, the court appointed an attorney for Mehralian on December 5, 1979. The attorney submitted motions pursuant to Rule 16 of the North Dakota Rules of Criminal Procedure for a court order directing the State to produce discovery material. Depositions were taken of Mr. Swett, Jeana, and Sharon, pursuant to Rule 15(g), N.D.R.Crim.P. Mehralian's apparent theory at trial and in part on this appeal is that he was privileged to enter the home of Mr. and Mrs. Swett.

During voir dire of the jury preceding the trial, the assistant state's attorney engaged in the following questioning of a prospective juror:

"MR. MAUS: Have you ever heard of the Koran? Do you know what that is?

"WILLIAM MASSEY: I don't think so, no.

"MR. MAUS: The bible of the Muslim faith.

"WILLIAM MASSEY: Okay.

"MR. MAUS: Have you ever heard the phrase, "Death to the infidel"? Have you ever heard that phrase?

"WILLIAM MASSEY: I believe so.

"MR. MAUS: What would that mean to you?

"MR. BURESH [defendant's attorney]: Ojection, Your Honor. The questions are highly prejudicial.

"MR. MAUS: I think, Your Honor, the testimony is going to bring out that phrase in the trial, and I think the understanding of the witnesses as to what that means is relevant.

"THE COURT: I'll overrule the objection."

Mr. Swett testified during the trial as follows:

"Q [by assistant state's attorney, Mr. Maus]: Do you know what the Koran is?

"A Yes.

"Q Would you tell us, please, what that is?

"A My understanding is that it is the written prescription for life in the Islamic religion as prescribed by the Prophet Mohammed. It's based on the Judeo-Christian ethic.

"Q Are you aware of any teaching of the Koran?

"A I think the one that strikes me most in these times is perhaps from what we've seen on television with regard to our own relationship with Iran. And that is the complete rejection of anything non-Islamic.

"Q Do they have a phrase that characterizes what you just stated?

"A Well,—

"MR. BURESH: Objection, Your Honor. I fail to see the relevancy of this line of questioning....

"THE COURT: Mr. Maus?

"MR. MAUS: Your Honor, I'm introducing this testimony to show the motive of the defendant in entering the Swett residence and in entering Sharon Swett's residence, and describing all his actions. I think the motive is always relevant. And there are bases in fact in that religion to explain some of the actions of the Defendant.

.       .       .       .       .

"Q (Mr. Maus continuing) Now, on this occasion back in December of '78, when you first met the Defendant, when he told you that he was Greek, did you talk to him about his visa status?

"A Not at that time. I was told at that time that he was here on a student visa....

.       .       .       .       .

"Q Are you familiar with the term American visa fraud?

"A Yes.

"Q Will you tell us, please, what that is?

"A This is a type of fraud that is perpetuated by many aliens coming to our country, and to some other countries. Aliens under one pretext or another, and then because it is frequently the only way he can remain in the country, he will marry a national of that country and seek to obtain immigrant status.

.       .       .       .       .

"Q Was there a confrontation between yourself and the Defendant?

"A On several occasions. On several issues.

"Q Did any of these take place in the kitchen of your home?

"A It did. And my son was present at the time as well. The Defendant, as you call him, was extolling the virtues of the Marxist society to us. I suggested that maybe he'd happier if he went to the Soviet Union to live. And he suggested maybe he would.

"Q Who else was present at that time?

"A My son Mark.

"Q And the Defendant?

"A And he was present, yes.

"Q Did the Defendant say anything about your daughter Jeana on that occasion?

"A No. He said several things. Primarily this was an argument about—I was arguing that I didn't think she should go back with him, because it was obvious to me and to other members of my family that he wasn't making her very happy, that's why she left. She was unhappy. She was very distressed. And this is what we were arguing over.

"Q Did the Defendant call your daughter a name?

"A He did. I'm reluctant to repeat it, but he did. That's something I wouldn't like to say.

"Q But I would ask you to repeat it.

"MR. BURESH [defendant's attorney]: Objection. Hearsay.

"MR. MAUS: It's not hearsay. It's admission of party.

"THE COURT: Overruled. He has asked you to repeat that name.

"A Well, in the presence of myself and my son he referred to my daughter as an American cunt. . . ."

Jeana Swett also testified at the trial. She testified that Mehralian entered her parents' home at 5 a. m. on November 20, 1979; however, none of the remaining members of the Swett family were awakened by Mehralian. Mr. Swett did not see Mehralian, but testified that he was "awakened with a feeling that I had heard some noise of some kind". Jeana testified that she led Mehralian out of her parents' home and did not inform her father of Mehralian's presence at the time because violence would have ensued. She also testified that Mehralian had harassed her on several occasions. Upon further questioning, Jeana stated that when she visited friends' homes, their windows would be broken and the tires on their cars had been slashed; however, she could not verify that Mehralian was responsible for these occurrences. During his closing argument, the assistant state's attorney relied heavily upon the testimony elicited earlier in emphasizing Mehralian's motive for entering the Swetts' home and his lack of affection for Jeana:

"MR. MAUS: Nothing but an American cunt? Dirty words. I think we know what the Defendant's attorney meant when he started out saying that this thing was sick and unfortunate. I think we know a lot about the Defendant that we didn't know six hours ago.

.    .    .    .    .

"What did we learn about the defendant today? We learned that he's an Iranian that tells people he's a Greek for some reason. We learned that he lived with his wife from August of '78 until July or August of '79, and then she knew very little about him, that he had no visible means of support, that he was interested in a daughter of a U.S. diplomat. Think about those facts for awhile. Think about what that infers about the Defendant. Think about how you would feel if you had been in the situation the Swett family was, somebody continuously calling you, circling your house, slashing tires, breaking windows, and then breaking into your house in the middle of the night. . . ."

Mehralian did not testify at the trial and at a sentencing hearing after Mehralian had been convicted, his attorney submitted a motion to withdraw as counsel for Mehralian on appeal because of a conflict of interest arising out of the grounds for appeal asserted by Mehralian. The court denied the motion to withdraw and the attorney appealed the ruling to this court on April 29, 1980. In the intervening period he filed a notice of appeal for Mehralian on April 18, 1980. He also obtained a stay of execution of the judgment pending Mehralian's appeal and a reduction of the amount of the bond required for release during the appeal period and submitted a motion for modification of post-conviction relief to this court on May 12, 1980. We granted Mehralian's motion in part by reducing the amount of his bond from $5,000 to $500. On July 23, 1980, this court granted the attorney's motion to withdraw from the case as counsel for Mehralian on appeal. A subsequent court-ap-

pointed attorney was also allowed to withdraw as Mehralian's attorney because the second attorney was a member in the first attorney's law firm. We granted the subsequent attorney's application for a supervisory writ and directed the court to appoint a new court-appointed counsel for Mehralian. A third court-appointed counsel was also permitted to withdraw as counsel and the attorney representing Mehralian on this appeal was subsequently appointed by the trial court.

Mehralian asserts three issues for our consideration:

1. Whether or not Mehralian received adequate representation by his first court-appointed counsel.
2. Whether or not Mehralian was privileged to enter the home of Mr. and Mrs. Swett while Jeana lived there.
3. Whether or not the court committed reversible error when it allowed the State to pursue several lines of questioning which Mehralian contends were irrelevant and highly prejudicial.

## I

The Sixth Amendment to the United States Constitution provides, in pertinent part, "In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence". The right to counsel accorded to the accused by the Sixth Amendment was extended to the States by the Fourteenth Amendment to the United States Constitution in *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). See also *Argersinger v. Hamlin*, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972), *Douglas v. California*, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963), reh. den. 373 U.S. 905, 83 S.Ct. 1288, 10 L.Ed.2d 200. Incompetence of counsel results in a denial of the accused's Sixth Amendment rights. In *State v. Kroeplin*, 266 N.W.2d 537 (N.D.1978), we stated that the standard of effective counsel is "not errorless counsel and not counsel judged ineffective by hindsight, but counsel reasonably likely to render and rendering reasonably effective assistance". *West v. State of Louisiana*, 478 F.2d 1026, 1033 (5th Cir. 1973). See also *State v. Bragg*, 221 N.W.2d 793 (N.D.1974); *State v. McKay*, 234 N.W.2d 853 (N.D.1975); *State v. Motsko*, 261 N.W.2d 860 (N.D.1978). The party alleging inadequacy of defense counsel has the burden of proving this fact. In addition, defense counsel in a criminal case is presumed to be competent and adequate in the absence of evidence overcoming the presumption. *State v. Berger*, 148 N.W.2d 331 (N.D.1967); *State v. Metzner*, 244 N.W.2d 215 (N.D.1976).

Mehralian asserts that his defense counsel at trial was inadequate because defense counsel failed to pursue many lines of inquiry including the defense of privileged entry into the home of Mr. and Mrs. Swett in order to see Jeana. Mehralian does not ignore the fact that his defense counsel asserted privilege as a defense several times during the trial. Nevertheless, Mehralian asserts that the defense of privilege should have been explained in a better manner. The second alleged deficiency of counsel consisted of the defense counsel's failure to suggest an alibi defense. The third alleged deficiency of counsel consisted of defense counsel's failure to call on Mehralian to testify at the trial and the failure to call witnesses on Mehralian's behalf. The final ground upon which Mehralian bases his claim of inadequacy of counsel is counsel's failure to object to prejudicial, leading, or irrelevant questions asked by the assistant state's attorney at the trial.

After examining the record, we conclude that there is no showing that Mehralian's defense counsel was inadequate. Mehralian's defense counsel asserted the defense of privilege throughout the course of the trial, but the trial court consistently did not accept privilege as a defense because it did not apply in the case. Mehralian's counsel preserved the issue of privilege as a defense for the purpose of this appeal; thus, no claim of inadequacy of defense counsel can be based upon defense counsel's failure to more fully explain the defense because the defense counsel did all that he

could do under the circumstances. Similarly, defense counsel's failure to suggest an alibi defense to the charge of criminal trespass was not inadequate representation. Apparently Mehralian's contention is based on the fact that Mr. Swett did not actually see Mehralian at the time Mehralian was in the Swett home. Jeana testified at the trial that Mehralian was in her bedroom, which was located in the Swetts' home. All of the evidence available to Mehralian's counsel suggested that Mehralian did not possess an alibi defense. In an order to show cause hearing held in the district court, the district court had determined that Mehralian had violated a restraining order which required him to avoid contact with Jeana. Despite Mehralian's continued assertion that he did not enter the Swetts' home, the district court found Mehralian's version of the facts to be not credible. Although Mehralian suggested that he had been with his brother on the night in question, Mehralian's defense counsel could not establish the alibi defense as a certainty because the witnesses available to him could not testify that Mehralian had accompanied them and stayed with them on November 20, 1979. Counsel for the accused cannot be expected to engage in tactics of a devious or possibly unethical nature. Defense counsel had already urged privilege as a defense; therefore, an assertion of an alibi defense would have seriously questioned the basis for either defense and could have been harmful to Mehralian.

Mehralian also alleges that he received inadequate representation of counsel because he was not called to testify at the trial and because no witnesses were called on his behalf. We stated in *State v. Hanson*, 73 N.W.2d 135 (N.D.1955), that when an accused voluntarily chooses to testify at trial, he waives his constitutional privilege against incrimination and may be impeached and asked questions as to other offenses he may have committed. While it is not clear that this was the basis for Mehralian's failure to testify, we can reasonably infer from Mehralian's testimony in previous hearings that the decision not to testify was a proper one. The testimony given by Mehralian in the previous proceedings was evasive and riddled with inconsistencies. Ultimately, Mehralian concurred in his defense counsel's advice that he should not testify. However, Mehralian now argues that he expected the evidence introduced at trial to prove his innocence. We believe that Mehralian received adequate assistance of counsel on this issue in light of Mehralian's previous inconsistent testimony, which disclosed a sound reason for defense counsel's advice not to have Mehralian testify at trial. Similarly, the failure of defense counsel to present witnesses to testify on Mehralian's behalf was not inadequate assistance of counsel because Mehralian does not name or demonstrate how any potential witnesses, who could have been called to testify at the trial, could have testified in his favor. Ultimately, the jury found Mehralian not guilty on one charge of criminal trespass. This is an indication that Mehralian's counsel was effective.

Finally, Mehralian asserts that his defense counsel did not object to prejudicial, leading, or irrelevant questions posed by the assistant state's attorney at the trial. The record discloses that no objection was made to several lines of questioning at the trial. However, the defense counsel did object to the questioning when irrelevant and prejudicial questions were initially asked. His failure to object to such questioning at later points in the trial was unnecessary because the trial court had already ruled on such objections. The requirements for an effective appeal on any proper issue are:

1. That the matter has been appropriately raised in the trial court so that the trial court can intelligently rule on it; and

2. That there be a valid appeal from the judgment.

*State v. Bartkowski*, 290 N.W.2d 218 (N.D. 1980); *State v. Johnson*, 231 N.W.2d 180 (N.D.1975). Defense counsel for Mehralian met the first requirement; therefore, continued objections were unnecessary.

## II

The second issue raised by Mehralian concerns whether or not Mehralian was privileged to enter the Swett home while Jeana lived there. The testimony given at the trial indicated that Mr. Swett had made it known to Mehralian that he was not welcome in the Swett home. Nevertheless, Mehralian contends that he had a privilege to enter the Swett home in order to visit his wife, Jeana, despite the fact that the trial court had issued a restraining order which prohibited Mehralian from seeing Jeana. The issue of privileged entry was relevant to the case because § 12.1–22–03(2), N.D.C.C., provides as follows:

"*12.1–22–03. Criminal trespass.* 1. . . .

"2.  A person is guilty of a class A misdemeanor if, knowing that he is not licensed or privileged to do so, he:

a.  Enters or remains in any building, occupied structure, or storage structure, or separately secured or occupied portion thereof; or

b.  Enters or remains in any place so enclosed as manifestly to exclude intruders."

Mehralian asserts that Rule 504 of the North Dakota Rules of Evidence applies in this context. Chapter 12.1–22, N.D.C.C., does not state what privileges may constitute a valid defense within the scope of its provisions. Section 12.1–22–03(2), N.D.C.C., was modeled after § 1712(2) of the Proposed Federal Criminal Code, which also fails to indicate what the word "privilege" means. Finally, the legislative history surrounding the enactment of the section does not indicate what the word "privilege" means under § 12.1–22–03(2), N.D.C.C. Rule 504, N.D.R.Ev., is substantially the same as Rule 504 of the Uniform Rules of Evidence.[1] Rule 504, N.D.R.Ev., does not apply to § 12.1–22–03(2), N.D.C.C., because the section is concerned with a privileged entry into buildings, occupied structures, or storage structures, and not with confidential communications. Consequently, we must construe the word "privileged" as contained in § 12.1–22–03(2), N.D.C.C. Section 1–02–02, N.D.C.C., provides that words used in any statute are to be understood in their ordinary sense, unless a contrary intention plainly appears. Webster's Third New International Dictionary (Unabridged 1971), p. 1805, defines the word "privilege" as encompassing "any of various fundamental or specially sacred rights considered as peculiarly guaranteed and secured to all persons by modern constitutional governments (as the enjoyment of life, liberty, and reputation, the right to acquire and possess property, the right to pursue happiness)". We believe that the privilege referred to in § 12.1–22–03(2), N.D.C.C., is the freedom or authority to act and to use the property. It is clear that Mehralian was told by Mr. Swett that he was not welcome in the Swett home. Thus, the trial court did not commit error by refusing to accept Mehralian's claim of privileged entry.

## III

Mehralian's final contention concerns whether or not the trial court com-

---

1.  The Rule recognizes a privilege for confidential communications. The traditional justifications for privileges not to testify against a spouse and not to be testified against by one's spouse have been the prevention of marital dissension and the repugnancy of requiring a person to condemn or be condemned by his spouse. 8 Wigmore §§ 2228, 2241 (McNaughton Rev.1961). The Rule evolved from its early medieval form of an absolute spousal disqualification into a privilege. The husband-wife privilege as it is referred to in Rule 504 is a bifurcated concept which has led to some confusion. Rule 504, N.D.R.Ev., protects confidential marital communications and protects information privately disclosed between husband and wife in the confidence of the marital relationship. See *Blau v. United States*, 340 U.S. 332, 71 S.Ct. 301, 95 L.Ed. 306 (1951). The second concept refers to the privilege against adverse spousal testimony which prevents the testimony of one spouse against the other unless both consent. See *Hawkins v. United States*, 358 U.S. 74, 79 S.Ct. 136, 3 L.Ed.2d 125 (1958). The *Hawkins* rule was not limited to confidential communications, but excluded all adverse spousal testimony. The rule was recently rejected by the United States Supreme Court in *Trammel v. United States*, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980), and modified in order to accord to the witness-spouse alone a privilege to refuse to testify adversely.

mitted error when it allowed the State to pursue several lines of questioning which Mehralian contends were irrelevant and highly prejudicial. Mehralian's contention must be viewed in the circumstances existing at the time of the trial. We take judicial notice that the American Embassy in Tehran, Iran, was seized on November 4, 1979, by Iranian militants and that a number of American citizens were taken as hostages. Since that time, a steady increase in concern for the safety of these Americans held in Iran has occurred in the collective conscience of the citizens of the United States. The right to a jury trial subsumes the right to a fair trial because fair play is the essence of due process. The control of the scope of opening and closing arguments is largely a matter left to the discretion of the trial court and the case will not be reversed on the ground of exceeding such scope unless a clear abuse of discretion is shown. *State v. Henderson*, 156 N.W.2d 700 (N.D.1968). Similarly, the control of remarks of counsel during criminal trials is also a matter within the discretion of the trial court and a reversal will result only in cases of clear abuse of discretion. *State v. Loyland*, 149 N.W.2d 713 (N.D.1967). No definite rule exists by which it may be determined whether error by a trial court in a criminal action, in passing upon a question of law, is prejudicial. *State v. Manning*, 134 N.W.2d 91 (N.D.1965). An error is reversible only if it appears from the record that the error was prejudicial, that substantial injury resulted, and that a different decision probably would have resulted absent the error. *State v. Marmon*, 154 N.W.2d 55 (N.D.1967); *State v. Allen*, 237 N.W.2d 154 (N.D.1975). A state's attorney's statements of fact to the jury which are not warranted by the evidence are improper and such statements are presumed to be prejudicial unless harmless in themselves. *State v. Youman*, 66 N.D. 204, 263 N.W. 477 (1935). Where inadmissible evidence is admitted during trial and is so impressive that its effect was not removed by its subsequent withdrawal or by an instruction to disregard it, the judgment will be reversed and a new trial granted. *State v. Schlittenhardt*, 147 N.W.2d 118 (N.D. 1966).

Mehralian's counsel objected to several questions asked by the assistant state's attorney both on voir dire of the jury and during the course of the trial itself. Specifically, defense counsel objected to the question asked of a prospective juror on voir dire by the assistant state's attorney who asked the juror, "Have you ever heard the phrase, 'Death to the infidel'?" Also, during the trial defense counsel objected to a line of questioning concerning Mehralian's religious faith. Finally, the assistant state's attorney asked questions concerning Mehralian's visa status and the definition of the "American visa fraud" and in his closing argument referred to other alleged crimes committed by Mehralian against the friends of the Swett family.[2]

These questions by the assistant state's attorney were improper. They tended to incite anger against Mehralian, who was an Iranian citizen in this country on a visa during the time following the unlawful and unprecedented takeover of the American Embassy in Tehran by Iranian militants. The references to the Koran, to Mehralian's visa status, to his statement to Mr. Swett, and finally to other wrongs he may have committed (which were not established at trial) were highly prejudicial. It is questionable whether or not it was proper for the assistant state's attorney to refer to prior conduct of Mehralian from which pri-

---

**2.** An issue not raised by Mehralian at the trial concerns whether the complaint alleged the commission of a crime. The complaint merely stated that Mehralian entered the home of the Swetts and that these acts violated § 12.1–22–03(2), N.D.C.C. Rule 7(c), N.D.R.Crim.P., requires that the information name or identify the defendant, and shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged. The provision is for the benefit of the defendant in order to more fully inform him of the nature of the charge against him and to facilitate the preparation of a defense. As to questions on the form and sufficiency of the information or indictment, see 1 Wright, Federal Practice & Procedure, Criminal § 123.

or wrongs may have been inferred. See *State v. Jensen*, 282 N.W.2d 55, 66–69 (N.D. 1979). In any case, Rule 403, N.D.R.Ev., provides that evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Being in its terms unlimited, Rule 403 applies to all forms of evidence: direct and circumstantial, testimonial, documentary, real proof, and demonstrations. While Mehralian's counsel did not object to all of the questions asked by the State, the objections which he made during voir dire and the trial itself are sufficient to support raising the issue of unfair procedure and resultant prejudice on appeal. The testimony elicited from Mr. Swett by the assistant state's attorney had a prejudicial effect which far exceeded its relevancy. The state's attorney's references in his closing argument to Mehralian's other wrongs were not established by the evidence and were improper in that they far exceeded the bounds of permissible argument. The trial concerned the charges of criminal trespass and not Mehralian's visa status. Finally, Mehralian's religious faith could in no way be considered relevant to the case. All of these circumstances lead us to conclude that Mehralian was denied a fair trial.

▮ Under our constitutional system, courts stand as a refuge for those who are weak, outnumbered, or victims of prejudice or public excitement. This responsibility requires that rights be preserved for the benefit of every human being subject to our Constitution—of whatever race, creed, persuasion, and under all circumstances. On the basis that Mehralian was denied a fair trial, we conclude that the judgment of conviction entered against Mehralian must be reversed and, therefore, the case is remanded for a new trial before a judge other than the judge who presided at the trial. The designation of that judge shall be made when such a request is presented to this court by the presiding judge of the Southwest Judicial District.

ERICKSTAD, C. J., and PEDERSON and VANDE WALLE, JJ., concur.

SAND, Justice (specially concurring).

I agree with the opinion authored by Justice Paulson that defendant Mehralian did not receive a fair trial. Nevertheless, I believe it is appropriate to make additional comments lest certain matters be deemed to have been given tacit approval.

The complaint, in part, states that defendant "did enter ... the home of Darwin Swett at 611 2nd Avenue West, Dickinson, North Dakota. That said acts of the Defendant are in violation of Section 12.1–22–03 of the North Dakota Century Code and constitute a Class A Misdemeanor."

The key language "knowing that he is not licensed or privileged to do so" is not and was not part of the complaint. If it can be successfully contended by stating "in violation of Section 12.1–22–03 of the North Dakota Century Code" that the defendant is then adequately informed, it would be permissible to simply state that on a certain day and place the defendant violated § 12.-1–22–03, N.D.C.C. I think it would be apparent to anyone that this would not be adequate and would not satisfy due process. Such a procedure would not comport or comply with the sixth amendment to the United States Constitution which states in part that the defendant is "to be informed of the nature and cause of the accusation" or § 13 of the North Dakota Constitution or Rules 3 and 4 of the North Dakota Rules of Criminal Procedure. While it is true that the defendant could ask for a bill of particulars, but that in effect would be asking the defendant to help draft the complaint against himself, which I do not believe is contemplated under any concept of our due process.

The complaint should have been dismissed on the grounds that it did not adequately inform the defendant of the charge against him as required by the United States Constitution, sixth amendment; the North Dakota Constitution § 13; and the North Dakota Rules of Criminal Procedure, Rules 3 and 4.

In addition, the defendant erroneously attempted to set up a defense upon the

grounds of "privilege" as found in the Rules of Evidence relating to confidential communications between husband and wife but did not establish how such "privilege" was involved in this trial. Somehow the terms "privilege" and "privileged" became intertwined. The statute defining the crime of criminal trespass uses the words "not licensed or privileged." These terms, in the context in which they would have been found in this case, if the complaint had been drawn properly, simply would have meant that the defendant impliedly or expressly did not have permission or authority from a proper person to enter the building or premises. The term "privilege" is not the equivalent of a right even though in a general sense it can be a right if certain conditions are first met, but initially "privilege" is not the equivalent of a right. In this respect there is a shade of difference between the word "privilege" and the word "privileged." The term "privileged" should be defined, and not the term "privilege." It is a commonly accepted principle that words take on their full and true meaning from the context in which they are used.