STATE of North Dakota, Plaintiff
and Appellee,

v.

Byron MANKE, Defendant
and Appellant.

Cr. No. 848.

Supreme Court of North Dakota.

Dec. 30, 1982.

Owen K. Mehrer, State's Atty., Dickinson, for plaintiff and appellee State of N.D.

Eugene F. Buresh, of Freed, Dynes, Reichert & Buresh, Dickinson, for defendant and appellant.

VANDE WALLE, Justice.

Byron Manke was tried by a Stark County district court jury and found guilty of committing the crime of gross sexual imposition in Violation of Section 12.1–20–03(1)(a) and (d) of the North Dakota Century Code. The district court entered a judgment of conviction from which the defendant, Manke, now appeals. We affirm.

On June 16, 1981, "Betty," a pseudonym, then 13 years old, complained to the Dickinson police that earlier in the day she had been forced by Byron Manke to engage in anal, oral, and vaginal intercourse with him in his apartment. Prior to making the complaint and soon after the alleged rape had occurred, Betty telephoned a friend who worked at a hospital in Dickinson to tell her what had happened. Betty's friend brought her to the emergency room of the hospital, notified the police, and then contacted a physician to examine Betty.

The examination was of a type routinely performed in cases involving persons who have complained of being raped. In this case, the examination produced, among other things, swabs taken from the vagina, the anus, and the mouth, plus hair samples taken from the scalp and the pubic area, all of which were sealed in containers and given to a police officer. These items, which are collectively referred to as a "rape kit," were then sent to the State Laboratories Department for analysis.

In the course of their investigation, the police on June 23, 1981, obtained a warrant to search Manke's apartment for evidence of the rape. The search was conducted the following day and yielded one pillow case and two bed sheets which also were sent to the State Laboratories Department for analysis.

The police continued the investigation, and on December 3, 1981, Manke was formally charged with having committed the crime of gross sexual imposition.

Following his trial and conviction, Manke appealed to this court, presenting four issues for our consideration.

I

The trial judge in preparation for Manke's trial ordered the State's Attorney to endorse upon the criminal information the names of the witnesses he intended to call to testify at the trial. See Rule 7(g), N.D.R.Crim.P. The State failed, within the time limits prescribed by the court, to endorse the name of Aaron Rash, a chemist with the State Laboratories Department, who performed the analysis of the items the laboratory had received from the Dickinson police department in connection with Betty's case. For its failure, the State was refused permission to endorse Rash as an additional witness.

Since it could not call Rash as a witness, the State sought to introduce a laboratory report prepared by Rash which gave the results of the examination and analysis of the items. The court decided, over the objection of defense counsel, to receive the laboratory report in evidence under Rule 803(8), N.D.R.Ev., but only on condition that Rash be made available at trial for cross-examination by the defendant.

Manke's first argument is that the trial court erred in deciding to admit the laboratory report in evidence because the laboratory report is hearsay and does not come within the exception to the hearsay rule set forth in Rule 803(8), N.D.R.Ev.

Technically, the laboratory report prepared by Aaron Rash is hearsay. Rule 801(c), N.D.R.Ev., defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." The laboratory report contained statements [see Rule 801(a), N.D.R.Ev.] which were not testified to by Rash at the trial, and which were offered to show that the findings which they represented were true. It should be pointed out that the traditional reason given for the hearsay rule is the lack of opportunity to cross-examine the hearsay declarant. 5 Wigmore, *Evidence* §§ 1362, 1371; Explanatory Note, N.D.R.Ev. § 803.

■ We believe that a thorough understanding of the reasons for and the purposes intended to be accomplished by the adoption of Rule 803(8), N.D.R.Ev., in its present form confirms the trial court's decision to receive the laboratory report in evidence.[1]

As a preliminary matter, we observe that the requirement of 803(8), N.D.R.Ev., that a public official make the investigation pursuant to authority granted by law is satisfied in this case. Section 19-01-10, N.D.C.C., authorizes the State Laboratories Department, a public agency of which Aaron Rash is an employee, to

" . . . make or cause to be made, analysis, examination, inspection, or test of any product, article, composition, or thing at the request of any prosecutor, defense counsel, or law enforcement officer in the state of North Dakota when such analysis, examination, inspection, or test is made in connection with an investigation into violations of the criminal law of this state. . . ."

We further observe that the requirements in the rule that the report contain "factual findings" which are the result of an "investigation" and that the proponent of the factual findings furnish a copy of them to the party against whom they will be offered "sufficiently in advance of its offer in evidence to provide the adverse party with a fair opportunity to prepare to meet them" are also satisfied in this case. The results of scientific testing have specifically been held to constitute "factual findings resulting from an investigation." *United States v. Oates,* 560 F.2d 45 (2d Cir.1977). An examination of the trial record reveals the uncontradicted statement of the State's Attorney at the offer of proof was that the laboratory report was provided to defense counsel well in advance of trial.

■ We begin our determination of the proper application of Rule 803(8), N.D.R.Ev., to the facts of this case with a brief discussion of the relation between principles for construing statutes and principles for construing rules of court. Although rules of court, such as the North Dakota Rules of evidence, are not legislative enactments, they should be treated as legislative enactments to the extent that they should be interpreted in accordance with principles of statutory construction.[2] See, e.g., *Disciplinary Board of the Supreme Court v. O'Neil,* 326 N.W.2d 879 (N.D.1982); *State v. McIntyre,* 92 Wash.2d 620, 600 P.2d 1009 (1979); *State v. Windmiller,* 579 S.W.2d 730 (Mo. App.1979). Accordingly, rules of court should be interpreted with a view toward effectuating their intent and in light of the

1. Subdivision (8) of Rule 803, pertaining to hearsay exceptions, is set forth in its entirety as follows:

"(8) *Public Records and Reports.* Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (i) the activities of the office or agency, or (ii) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (iii) in civil actions and proceedings and against the State in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness. However, factual findings may not be admitted under this exception unless the proponent of them furnishes to a party against whom they are now offered a copy thereof, or so much thereof as relates to the controversy, sufficiently in advance of its offer in evidence to provide the adverse party with a fair opportunity to prepare to meet them. The adverse party may cross-examine under oath any person making the report or factual findings or any person furnishing information contained therein, but the lack of availability of that testimony does not affect admissibility of the report or factual findings unless, in the opinion of the court, the adverse party is prejudiced unfairly thereby."

2. Of course, the principles of statutory construction should be considered in combination with the general construction principle recited in Rule 102, N.D.R.Ev. Rule 102 states:

"These rules shall be construed to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence, to the end that the truth may be ascertained and proceedings justly determined."

purposes which prompted their adoption. See *Barnes Cty. Ed. Assn. v. Barnes Cty. Sp. Ed.,* 276 N.W.2d 247 (N.D.1979); *Hughes v. State Farm Mut. Auto. Ins. Co.,* 236 N.W.2d 870 (N.D.1975). And the way we determine their intent is the same as the way we determine legislative intent: namely, by examining the *language* and *scope* of the rule, its *history,* and by considering its *purpose. R.B.J. Apts., Inc. v. Gate City S. & L. Assn.,* 315 N.W.2d 284 (N.D.1982).

Rule 803, N.D.R.Ev., in relevant part states:

"The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

.    .    .    .    .

"(8) *Public Records and Reports.* Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... (iii) in civil actions and proceedings against the State in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness."

Although the letter of the rule does not explicitly permit, and may even exclude by implication, the introduction in evidence of evaluative reports[3] against the defendant in a criminal case, we are firmly convinced by a reading of the history and expressed purpose of the rule that to hold that Rule 803(8), N.D.R.Ev., does not permit the introduction in evidence of the laboratory report against Manke where the author of the report is present in the courtroom and subject to cross-examination would thwart the true purpose of the rule.

The North Dakota Rules of Evidence were patterned largely after the Federal Rules of Evidence (F.R.Evid.). The portion of Rule 803(8) reproduced above is identical with its Federal counterpart, Rule 803(8)(C).[4] Because that part of Rule 803(8) under discussion is a verbatim adoption of Rule 803(8)(C) [see Explanatory Note, Rule 803, N.D.R.Ev.], we look at the legislative history of Rule 803(8)(C) to acquire an understanding of the objectives the draftsmen intended to achieve through its adoption. Furthermore, in accordance with well-recognized decisions of this court, we also consider Federal cases which interpret and construe Rule 803(8), F.R.Evid., to aid in deciding how to apply our Rule 803(8) in this case. *Marmon v. Hodny,* 287 N.W.2d 470 (N.D.1980); *Burlington Northern v. N.D. Dist. Court, Etc.,* 264 N.W.2d 453 (N.D.1978); *State v. Hamann,* 262 N.W.2d 495 (N.D.1978); *State v. Storbakken,* 246 N.W.2d 78 (N.D.1976); *State v. Holy Bull,* 238 N.W.2d 52 (N.D.1975).

The justification generally given for the "public records" exception to the hearsay rule is "the assumption that a public official will perform his duty properly." Notes of the Advisory Committee on Proposed Rules (hereinafter "Advisory Committee's Notes"), Rule 803(8), F.R.Evid. In the context of Rule 803(8)(C),[5] this translates into an assumption that a public official who makes an investigation pursuant to authority granted by law will properly conduct the investigation and correctly report the factual findings which are a result of the investigation.

Reports which qualify under this exception to the hearsay rule are not automatically admissible in evidence; Rule 803(8)(C) permits the party against whom the report is offered to challenge the trustworthiness and reliability of the findings. The Advisory Committee's Notes to Rule 803(8)(C), F.R.Evid., suggest four factors which may be considered in deciding whether the report is unreliable or lacks trustworthiness. They are: (1) the timeliness of the investi-

---

**3.** That is, the type of reports with which Rule 803(8)(iii), N.D.R.Ev., is concerned.

**4.** They are identical except that where Rule 803(8)(C), F.R.Evid., has the word "Government," Rule 803(8), N.D.R.Ev., has the word "State."

**5.** To avoid confusion, we will refer only to Rule 803(8)(C) in much of the discussion which follows; however, anything said about Rule 803(8)(C), F.R.Evid., should also be considered as a statement about Rule 803(8), N.D.R.Ev.

gation; (2) the special skills or experience of the official conducting the investigation; (3) whether or not a hearing was held; and (4) whether or not the report was made with any improper motive. The Advisory Committee's Notes further state:

"The formulation of an approach which would give appropriate weight to all possible factors in every situation is an obvious impossibility. Hence the rule ... assumes admissibility in the first instance but with ample provision for escape if sufficient negative factors are present."

Applying these suggested factors to the facts of the present case, we find from an examination of the record that:

(1) The investigation was timely. Betty allegedly was raped on June 16, 1981. The medical examination of Betty and the police investigation of the incident produced at least 30 separate pieces of evidence. The evidence was submitted for analysis and was received by the State Laboratories Department on June 17, 1981, and June 30, 1981; the results of the analysis were reported on August 31, 1981. No more than a month and a half transpired from the time of the alleged rape to the time of the issuance of the laboratory report. This is not an unreasonable amount of time to perform testing and to report the factual findings of that testing.

(2) The investigation was performed by a person who possessed special skill and experience. In the offer of proof made by the State, Aaron Rash testified regarding his education and training which consisted of a bachelor of science degree in chemistry; graduation from the Institute of Advanced Analytical Chemistry at Georgetown University; special graduate training in forensic serology at the University of Southeastern Mississippi; and attendance at workshops and seminars throughout the country.

(3) No formal administrative hearing was held. This fact, however, is merely a point to be considered in judging the trustworthiness of evaluative reports and in finally deciding whether or not to receive a report in evidence. See *Baker v. Elcona Homes Corp.*, 588 F.2d 551 (6th Cir.1978), *cert. denied* 441 U.S. 933, 99 S.Ct. 2054, 60 L.Ed.2d 661 (1979). Although a hearing may be useful in certain cases to ensure that the results of the investigation are the product of a fair, impartial, and just evaluation of the matters reported, in a case of this nature, where the factual findings reported are the product of scientific examination and testing, and consequently where there is little or no control over the results that are produced by the testing, there is less need to be concerned about the approach taken to the matters reported.

(4) There is nothing to indicate the laboratory report was made with any improper motive. Section 19–01–10, N.D.C.C., places the State Laboratories Department at the disposal of the prosecution and defense counsel; hence it is independent of both parties. The laboratory report itself is testimony of the objective and impartial manner in which it was prepared. The report made no reference to Manke. It contained only objective data. No inferences were drawn between the findings of the report and the probability of Manke's having committed the alleged rape of Betty. It is simply the reported findings of scientific, objective testing and examination.

Our consideration of these suggested factors and the reasons which led to the adoption of Rule 803(8)(C), F.R.Evid., and the admissibility of public records leads us to conclude, first, that the laboratory report is the type of public record which the draftsmen of Rule 803(8)(C) intended to be admissible as an exception to the hearsay rule, and, second, that the requirement that the public record possess adequate indicia of trustworthiness and reliability has been met and satisfied in this particular instance.

This brings us to the language of Rule 803(8)(C), which apparently limits the introduction of evaluative reports to "civil actions and against the Government [State] in criminal cases." The universally recognized reason for this limitation is that the admission into evidence of evaluative reports of public agencies against an accused in criminal cases would invariably cause an interference with his right to confront the wit-

nesses against him. See, e.g., *Oates, supra.* The Advisory Committee's Notes to Rule 803(8)(C) in this regard state:

"[Evaluative reports] are admissible only in civil cases and against the government in criminal cases in view of the almost certain collision with confrontation rights which would result from their use against an accused in a criminal case."

An accused's Sixth Amendment right to confrontation is fundamentally a trial right which consists of the right to cross-examination. *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Barber v. Page,* 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968).

Under the particular facts of this case, the precise circumstances which give rise to the reason for precluding the use of evaluative reports against a defendant in a criminal case do not exist. Aaron Rash was present at the trial;[6] moreover, the trial judge expressly conditioned receipt of the laboratory report in evidence on the availability of Rash for cross-examination. Manke in actuality had the opportunity to cross-examine Rash. Simply because he chose not to cross-examine Rash does not change the obvious fact that his right to confront the witnesses against him was wholly safeguarded.

In summary, the laboratory report (1) is a report of a public agency, (2) contains factual findings, (3) is the product of an investigation made pursuant to authority granted by law, and (4) has substantial indicia of trustworthiness and reliability. All the general requirements for the admissibility of public records in evidence under Rule 803(8), N.D.R.Ev., have been met in this case. Were it not for the limiting language of Rule 803(8), the laboratory report would be *clearly* admissible. However, taking into account that the only reason there is for denying the admission in evidence of an otherwise admissible evaluative report un-

der Rule 803(8) is to protect an accused's right in a criminal case to confront the witnesss against him, and that in this case the accused *did* have the opportunity to confront and cross-examine the author of the report sought to be introduced against him, it then becomes readily apparent that the sole reason for denying its admission disappears.

We believe that any interpretation of Rule 803(8), N.D.R.Ev., in the context of the present case which results in a determination that the laboratory report is inadmissible would not only exalt form over substance but also constitute a rigid and slavish adherence to the letter of the law in complete disregard of its intended meaning. See *Vincent v. Thompson,* 50 A.D.2d 211, 377 N.Y.S.2d 118 (N.Y.App.Div.1975).

Because principles of statutory construction are applied in the interpretation of rules of court [see *O'Neil, supra*], it may be argued that when "a statute [rule] is clear and unambiguous, the letter of the statute [rule] cannot be disregarded under the pretext of pursuing its spirit." *Barnes Cty., supra,* 276 N.W.2d at 249. Although this is a correct statement of the law, it is also true that,

"[If] adherence to the strict letter of the statute [rule] would lead to injustice, absurdity, or contradictory provisions, a duty descends upon the courts to ascertain the true meaning. [Citations omitted.] Thus, in pursuance of the general objective of giving effect to legislative intent, we *are not controlled by the literal meaning of the language of the statute* [rule], but the spirit or intention of the law prevails over the letter." *Barnes Cty., supra,* 276 N.W.2d at 249. [Emphasis added.]

To hold that the laboratory report is inadmissible under Rule 803(8), N.D.R.Ev., would lead to the absurd and contradictory

---

**6.** This circumstance makes us especially conscious of the fact that had the trial judge permitted Rash to testify, the issue now being considered would not have arisen.

Our purpose in commenting on this point is not to imply that the trial court's refusal to

allow Rash to testify was wrong, but only to suggest there are other less severe sanctions it could have used against the State for its failure to endorse Rash as a witness.

result that even though Manke's right to confront and cross-examine the witnesses against him was completely protected in this case, the laboratory report is inadmissible against him because his right to confront and cross-examine the witnesses against him must be protected.

To interpret Rule 803(8) in such a way as to require this result most certainly would not secure the "promotion of growth and development of the law of evidence" as is required by Rule 102, N.D.R.Ev. Consequently, we conclude that the laboratory report in question is admissible under Rule 803(8), N.D.R.Ev.

## II

Before trial, Manke moved the district court to order the suppression of any evidence obtained by the Dickinson police department from its search of his apartment.

In his brief prepared in support of the motion, Manke challenged the validity of the search warrant, arguing, in effect, that the warrant was improperly issued because the affidavit submitted pursuant to Rule 41, N.D.R.Crim.P., did not set forth sufficient facts to establish probable cause and because the warrant failed to specify a time in which the search was to be conducted. The State submitted a reply brief, and on January 21, 1982, a hearing was held on the motion, after which the court issued an order denying the motion.

Manke now argues that because the court heard oral arguments with respect to the motion to suppress evidence which were not recorded by the court and which were not summarized in the court's order, he is effectively foreclosed from arguing the court's error in denying his motion to suppress evidence.

In response to Manke's argument, we point out, first of all, that oral arguments of counsel are not evidence nor are they statements which we must consider in order to make a proper determination of whether or not the court erred in its decision on the motion. And, secondly, where, as in this case, the grounds put forward for challenging the motion to suppress are that the

affidavit in support of the search warrant as well as the search warrant itself are defective, all Manke need do to argue the court's error in denying his motion to suppress is to examine the affidavit and search warrant in the context of Rule 41 to see if the requirements for the issuance and contents of a search warrant have been observed.

■ Following the same prescription in this instance, we are satisfied that the court did not err in refusing to grant Manke's motion to suppress evidence. *State v. Mondo,* 325 N.W.2d 201 (N.D.1982); *State v. Klosterman,* 317 N.W.2d 796 (N.D.1982); *United States v. Bedford,* 519 F.2d 650 (3d Cir.1975), *cert. denied* 424 U.S. 917, 96 S.Ct. 1120, 47 L.Ed.2d 323 (1976); *State v. Post,* 286 N.W.2d 195 (Iowa 1980); *State v. Weiker,* 279 N.W.2d 683 (S.D.1979); *State v. Haron,* 88 S.D. 397, 220 N.W.2d 829 (1974).

## III

At this point, we direct our attention to Manke's argument that there was insufficient evidence presented at trial to support the jury's verdict.

■ Past decisions of this court have well established the standard of review which we will employ in cases challenging the sufficiency of evidence to sustain a conviction. In such cases we do not weigh conflicting evidence, nor do we judge the credibility of witnesses; instead, we look only to the evidence most favorable to the verdict and the reasonable inferences therefrom to see if there is substantial evidence to warrant a conviction. *State v. Cox,* 325 N.W.2d 181 (N.D.1982); *State v. Olson,* 290 N.W.2d 664 (N.D.1980); *State v. Larson,* 274 N.W.2d 884 (N.D.1979); *State v. Piper,* 261 N.W.2d 650 (N.D.1978); *State v. Allen,* 237 N.W.2d 154 (N.D.1975).

■ This statement of the rule appropriately emphasizes that:

(1) It is the exclusive function of the jury to weigh the evidence and judge the credibility of witnesses. See *State v. Allen, supra,* 237 N.W.2d at 161.

(2) A jury may find a defendant guilty even though evidence exists which *if believed* could lead to a verdict of not guilty. See *United States v. Lincoln,* 630 F.2d 1313 (8th Cir.1980).

(3) We must assume the jury believed the evidence which supports the verdict and disbelieved any contrary or conflicting evidence. See *State v. Pieschke,* 295 N.W.2d 580 (Minn.1980).

To determine whether or not there was sufficient evidence to sustain Manke's conviction we turn to the record to see if there is substantial evidence to establish each of the essential elements of the crime with which Manke was charged.

Section 12.1–20–03, N.D.C.C., in relevant part, states:

"1. A person who engages in a sexual act with another, or who causes another to engage in a sexual act, is guilty of an offense if:

"a. He compels the victim to submit by force or by threat of imminent death, serious bodily injury, or kidnapping, to be inflicted on any human being;

.    .    .    .    .

"d. The victim is less than fifteen years old; . . ."

According to Betty's testimony at trial, on June 15, 1981, she was staying with her grandmother and stepgrandfather at their apartment in Dickinson. Earlier that evening, her stepgrandfather, Joseph Degele, and Manke, who lived in an apartment across the hall from the Degeles, were drinking in the Degele apartment. Sometime around 2:30 a.m. on June 16, Betty, who had been sleeping by the stove in the kitchen, was awakened by her stepgrandfather, who was lying on top of her with his underwear down and her pajamas pulled down, trying to force her legs apart. At that point, Betty's grandmother entered the kitchen, and when she observed what was going on she kicked Betty and told her to get out. Betty went into the bathroom to get dressed and then ran across the hall to Manke's apartment.

Once in Manke's apartment, Betty explained to him what had just occurred in the Degele apartment. Manke left his apartment to, according to Manke's testimony at trial, confront Degele concerning the incident. He returned a few minutes later. A short time afterward, Joseph Degele went to Manke's apartment looking for Betty, but Manke told him she wasn't there. Degele left and Manke went to sit in a chair.

Manke was sitting in the chair and Betty was sitting at the kitchen table reading an engineering magazine when he called her to come over to him. Betty went to Manke, and he pulled her onto his lap, began kissing her, and attempted to remove her T-shirt. Betty struggled with Manke and tried to get away from him; however, she couldn't. Manke then took her to the bedroom, removed his and her clothes, and began to rape Betty.[7]

The "sexual act" as defined in Section 12.1–20–02(1), N.D.C.C., which Manke engaged in with Betty consisted of "sexual contact" between the penis and the vagina, the anus, and the mouth. Betty tried to stop Manke's sexual assault upon her and even asked him to stop, but he refused.

After three or four hours, near 7 a.m., Manke stopped his rape of Betty. He then told her that if she told anyone about what had just happened, she would regret it, and her father, who occasionally worked for Manke, would lose his job. Manke left for work, and it was at that time that Betty called her friend at the hospital.

Finally, it should be noted that on the date of the alleged rape, June 16, 1981, Betty was 13 years old.

Manke denied, while testifying at trial, that he had any sexual contact with Betty.

---

7. In this regard Betty testified:

"A. (No response) Then he raped me.
"Q. [Betty], now this is important, do you know what rape means?

"A. Yes.
"Q. Could you tell us what it means?
"A. It's when people have sex against his or her will."

However, the laboratory report, which was introduced in evidence against Manke, showed that the swab of Betty's vagina taken by the doctor in the emergency room contained acid phosphatase, which indicated the presence of semen.

■ Viewing the evidence presented at trial in the light most favorable to the verdict, and therefore assuming the jury believed Betty's testimony, we find that there is substantial evidence to show that on June 16, 1981, in Dickinson, North Dakota,

(1) Manke compelled Betty by force to engage in sexual acts with him; and

(2) Manke engaged in sexual acts with Betty when she was less than 15 years old.

Hence, we hold that there was sufficient evidence to sustain Manke's conviction for having committed the crime of gross sexual imposition in violation of Section 12.1–20–03(1)(a) and (d), N.D.C.C.

## IV

Manke's final argument is that he was denied his Sixth Amendment right to effective assistance of counsel.

The facts which give rise to this claim are as follows: Joseph Degele was charged with the offense of gross sexual imposition because of the alleged sexual contact he had with Betty on June 16, 1981. The court appointed the same counsel to represent both Manke and Degele. On March 16, 1982, sometime after Manke's trial, Degele pleaded guilty to the reduced charge of sexual imposition, a violation of Section 12.-1–20–04, N.D.C.C.

From these facts Manke reasons that insofar as he was represented by the same counsel appointed to represent Degele for the commission of a similar offense, arising out of the same basic set of circumstances and involving the same victim, his attorney was subject to a conflict of interest and he therefore was denied the effective assistance of counsel.

Manke seems to suggest as a particular instance of this conflict that it would have been impossible for counsel to call Degele as a witness to testify at Manke's trial regarding the events which allegedly occurred between Degele and Betty before she ran to Manke's apartment (apparently to shift the blame for the alleged rape of Betty to Degele and away from Manke), because then counsel would be defending Manke at Degele's expense.

Even if Degele had been represented by a different counsel, it is only a remote possibility that Degele would agree to testify about the events at issue in view of the fact that Degele had not yet pleaded guilty to the crime with which he was charged, and consequently it is almost a certainty he would have refused to testify by invoking his Fifth Amendment right against self-incrimination.

Manke cites a number of cases to support his argument that he received ineffective assistance of counsel, but, as he well recognizes, these cases involve representation by the same counsel of codefendants in a joint trial. In this case, Manke and Degele were not codefendants nor were they jointly tried; as a matter of fact, Degele was not tried at all. Thus we find these cases inapposite.

■ Once the issue of inadequacy of defense counsel has been raised, the party raising it has the burden of proving this fact. *State v. Mehralian*, 301 N.W.2d 409 (N.D.1981). Furthermore, it is presumed that defense counsel in a criminal case is competent and effective absent a showing to the contrary. *Mehralian, supra,* 301 N.W.2d at 415.

The mere fact that the same counsel represented both Manke and Degele does not prove ineffective assistance of counsel. The Supreme Court in *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), announced the principle that joint representation of codefendants is not absolutely prohibited by the constitutional guarantee of effective assistance of counsel. *A fortiori,* when two defendants are represented by the same counsel but are not codefendants and are not jointly tried, the

Sixth Amendment right to effective assistance of counsel is not automatically violated.

Although we realize there may be cases in which a conflict of interest arises because there is joint representation of defendants who are not yet codefendants and not jointly tried, we believe the potential conflicts which Manke associates with the facts of this case are more imagined than real; accordingly, we hold that he has failed to meet his burden of proving ineffective assistance of counsel.

For the foregoing reasons, we affirm the trial court's judgment of conviction.

ERICKSTAD, C.J., and PEDERSON, PAULSON and SAND, JJ., concur.